IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 2004 Session

## STATE OF TENNESSEE v. GDONGALAY P. BERRY.

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 96-B-866     J. Randall Wyatt, Judge**

_____

**No. M2001-02023-SC-DDT-DD - Filed August 23, 2004**

_____

A jury convicted the defendant, Gdongalay P. Berry, of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery, for the murders, kidnappings and robberies of DeAngelo Lee and Gregory Ewing.[1] Following a capital sentencing hearing, the jury found three aggravating circumstances in each murder: (1) that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person;[2] (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit robbery or kidnapping. Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (1996). The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Accordingly, the jury imposed sentences of death for each of the murder convictions. As to the remaining felony convictions, the trial court sentenced the defendant as a violent offender, and imposed an effective fifty-year sentence, to run consecutively to the death penalty.[3] The defendant appealed, challenging both his convictions and the sentences of death. After fully considering the issues raised by the defendant, the Court of Criminal Appeals affirmed the convictions and the sentences.

_____

[1]After sentencing, the trial court merged each felony murder count into the premeditated murder counts for each respective victim, leaving the defendant with two first-degree murder convictions.

[2]The jury found that the defendant had been previously convicted of first degree murder, aggravated assault, and two counts of aggravated robbery.

[3]The court sentenced the defendant to twenty-five years on each count, with the two sentences for kidnapping running concurrently, the two sentences for robbery running concurrently, but the sentences for the kidnappings and the robberies running consecutively to each other and to the murders, for a total effective sentence of death plus fifty (50) years.

The appeal was automatically docketed in this Court pursuant to Tennessee Code Annotated section 39-13-206 (2003). After considering the briefs and the record, this Court entered an order specifying five issues for oral argument,[4] including whether the indictment was sufficient, whether the failure of the Rules of Evidence to apply to capital sentencing hearings violated the rights to due process and confrontation, whether the evidence was sufficient to support the verdict, whether the defendant was denied his right to a speedy trial, and whether the death sentence was comparatively proportionate and valid under the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1)(A)-(D) (2003). After a careful and exhaustive review of the record and the legal authority relevant to the issues raised, we affirm the defendant's convictions and sentences.

**Automatic Appeal pursuant to Tennessee Code Annotated § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON and JANICE M. HOLDER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

Thomas F. Bloom and James A. Simmons, Nashville, Tennessee, for appellant, Gdongalay P. Berry.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; David Hamm and Katrin Miller, Assistant District Attorneys General, for appellee, State of Tennessee.

**OPINION**

**I. Background**

**A. Guilt Phase**

The nineteen-year-old defendant, Gdongalay Berry, was convicted of the first-degree premeditated murders, kidnappings, and robberies of nineteen-year-old DeAngelo Lee and eighteen-year-old Greg Ewing. The State's proof showed that the defendant and a separately tried co-defendant, Christopher Davis, arranged to purchase weapons for $1200 from Lee and Ewing on the evening of February 27, 1996. Earlier that evening, the defendant and Davis were at Davis's apartment drinking and smoking marijuana with Ronald Benedict, Antoine Kirby, and Antonio Cartwright. Cartwright testified at trial that he overheard Davis and the defendant talking about robbing the two victims and taking their guns and automobile. Cartwright testified that the

---

[4]"Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2 (2003).

defendant stated, "If we rob 'em, we gotta kill 'em . . . [b]ecause they know us."[5] Between 7:30 and 8:00 p.m. that evening, after receiving a telephone call from Lee, the defendant, Davis, and two other men identified as "Kay" and "Sneak"[6] left the apartment. Both the defendant and Davis were armed with guns – Davis with a 9mm handgun, the defendant with a .45 caliber handgun. Davis also carried a black bag containing handcuffs, rope, and duct tape. Approximately thirty minutes later, Kay and Sneak returned to the apartment. Thirty to forty-five minutes after that, the defendant and Davis also returned. They were driving Lee's Cadillac and were carrying at least six assault weapons, some pagers, and clothing, including Lee's distinctive green and yellow tennis shoes, and Ewing's jacket. Davis was wearing a gold cross necklace that belonged to Lee. The defendant told Cartwright that "Chris [Davis] couldn't kill Greg [Ewing], so I had to," and announced that he had shot Ewing multiple times in the head. After placing the assault weapons under Davis's bed, the defendant and Davis left the apartment in Lee's Cadillac and another vehicle. They drove to a sparsely wooded residential area off a dead-end street, set fire to the interior of the Cadillac, and abandoned it. The men then went to a Nashville motel where they spent the night.

The next morning, Ewing's and Lee's bodies were found lying on a hill at a construction site in south Nashville near Interstate 440. Both victims were only partially clothed. A rope on the ground led up the hill to the body of one of the victims. Ewing had been shot three times in the head, twice in the shoulder, once in the neck, and once in the abdomen. Lee had been shot three times in the head and once in the hand. Ballistics testing showed that the weapons used to kill the victims were 9mm and .45 caliber handguns.

By coincidence, at approximately 9:00 a.m. on the same morning the victims' bodies were found, three detectives from the Metropolitan Police Department went to Davis's apartment to investigate an unrelated crime. While questioning two men present at the apartment, Ronald Benedict and Antonio Cartwright, the detectives noticed the automatic rifles under the bed in Davis's bedroom. At about this time, the defendant, Davis, Dimitrice Martin (Davis's girlfriend), and Brad Benedict (Ronald Benedict's brother), unexpectedly rushed through the front door. Davis was talking on a cell phone and had a .45 caliber handgun in his waistband. The defendant was carrying a fully loaded automatic rifle. Startled to see police present, the defendant, Davis, and Brad Benedict turned and fled out the front door. The detectives pursued them and caught Davis. Benedict and the defendant escaped, although the defendant dropped the rifle he had been carrying. This rifle turned out to be one of the weapons stolen from Lee and Ewing.

A subsequent search of Davis's apartment yielded a 9mm pistol underneath the cushion of the couch where Ronald Benedict had been sitting. Forensic testing later revealed that the 9mm

---

[5] Co-defendant Davis's case, tried separately, is currently before this Court as well. We note that the transcript in Davis's trial reflects that Cartwright also testified in that case. Cartwright's testimony, however, differed in this respect: instead of claiming that defendant Berry made this statement, at Davis's trial Cartwright testified that it was Davis who made the statement, "If we rob 'em, we gotta kill 'em." We find this inconsistency insignificant, since in either case, both Davis and the defendant were present and in apparent agreement when the statement was made.

[6] "Sneak" was apparently the nickname for Ronald Benedict.

caliber bullets recovered from the victims' bodies were fired from this gun. The .45 caliber gun used in the crime was never found. Among the items police found in Davis's bedroom were a pair of handcuffs with a key, a pager, a cell phone, a Crown Royal bag containing $1400 in cash, a black backpack, a large quantity of ammunition, Lee's green and yellow tennis shoes, Ewing's jacket, two .45 caliber pistols, two SKS rifles, and one Universal .30 caliber M-1 carbine. At the time of the search, however, officers were unaware that the items were connected to the murders of Ewing and Lee.

Davis and his girlfriend, Dimitrice Martin, were taken to the police station for questioning. Before his interview, Davis removed Lee's gold cross necklace and told Martin to put it in her purse. He also instructed Martin to call Ronald Benedict's girlfriend at the apartment and tell her to dispose of Lee's green and yellow tennis shoes.

As a result of the questioning of Davis and Martin, police discovered the connection between Davis, the defendant, and the murders of Lee and Ewing. The police took Lee's necklace from Martin. One of the detectives returned to Davis's apartment to retrieve Lee's tennis shoes and Ewing's jacket. While he found Ewing's jacket on Davis's bed, the tennis shoes were gone.

After the defendant was eventually arrested on March 6, 1996, he waived his Miranda[7] rights and gave a statement to police in which he admitted that he had been with Davis when the victims were robbed and killed. He disavowed any active role in the crimes and claimed that he had not known Davis intended to kill the victims. According to the defendant, Davis and a third man, Christopher Loyal, had abducted Ewing and Lee after Ewing attempted to rob Davis. The defendant claimed that the victims were already handcuffed and restrained when he joined Davis and Loyal in the Cadillac. The group then drove to the construction site. Davis made the victims remove their clothing, and the defendant claimed he thought it would stop at that. As he watched, however, Davis and Loyal repeatedly shot the two men.[8]

The jury returned a verdict at the conclusion of the guilt phase and found the defendant guilty of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery.

## B. Penalty Phase

During the penalty phase of trial, the State presented victim impact evidence through the testimony of the mothers of the two victims. Both mothers testified that they were close to their sons

---

[7]Miranda v. Arizona, 384 U.S. 436, 444 (1966).

[8]Police investigation, however, eliminated Loyal as a suspect. Loyal testified as a state's witness at trial concerning events that occurred at Davis's apartment later on the night of February 27, 1996. This included the defendant and Davis arriving at the apartment in a white Cadillac and asking him to help them unload a cache of guns from the car, then driving around with them in the Cadillac until they dropped him off in Bordeaux. During the drive, Davis commented that although he was supposed to buy the guns, he had taken them instead.

and that they missed their companionship. Ewing's mother, Brenda Sanders, testified that she did not know until the trial that her son had been shot seven times, or that he had screamed for his life prior to his death. She testified that it gave her a certain sense of closure to hear that evidence. There was no objection during the presentation of this victim impact evidence.

Next, the State presented certified copies of the defendant's 1994 conviction for aggravated assault, his two 1998 convictions for aggravated robbery, and his 1999 conviction for first-degree murder. The State also relied upon the proof presented during the guilt phase of the trial to support imposition of the death penalty.

Through the testimony of a mitigation expert and several members of his family, the defendant presented extensive information about his background. He was born prematurely on September 5, 1976, to Frieda Berry and Fred Black. His parents never married, and throughout his life he had only sporadic contact with his father, who served a ten-year prison sentence for robbery. When the defendant was a year old, his mother married Laurice Thomas, with whom she had two sons. The defendant's immediate family also included another, older half-brother, the child of the defendant's mother and a third man. The Thomas's marriage was described as hostile and volatile. Both Thomas and the defendant's mother had mental health problems. The defendant's mother was repeatedly institutionalized for mental illness and variously diagnosed with schizophrenia, depression with psychosis, and bipolar disorder. In 1982, while his wife and the children were present in the home, Laurice Thomas committed suicide by shooting himself in the bathroom. As a result, the defendant's mother had a mental breakdown, and the defendant and his half-brothers eventually went to live with their maternal grandmother and step-grandfather. At his grandmother's home, the defendant was part of a large family consisting of his siblings and aunts and uncles, who grew up with him like brothers and sisters. The defendant's grandmother and step-grandfather were described as hardworking people, who provided a good home for the defendant. After the defendant's mother remarried, the defendant's mother and grandmother engaged in litigation over the children's custody. The defendant's mother's second husband also committed suicide by jumping off a bridge and drowning.

The defendant had to repeat the fourth and eighth grades. He was described as a good boy, who did his chores and loved children. He participated in school sports and excelled at wrestling. At fourteen, the defendant was sent to an alternative school for fighting on the school bus and at school. His family testified that when he returned to high school the following year, he was singled out and strip searched. At the age of eighteen, while in the tenth grade, the defendant dropped out of school and left his grandmother's home. According to the defendant's family, the defendant's change in behavior occurred because of the bad influence of other teenagers. For a short time, the defendant lived with his older half-brother, but he was asked to move out because of visits from his friends, who sold drugs.

The defendant has one child, a son born on May 2, 1996. When he learned that his girlfriend was expecting a child, the defendant tried to commit suicide by overdosing on medication.

The defendant chose not to testify, and confirmed this decision during a jury-out hearing held pursuant to State v. Momon, 18 S.W.3d 152, 162 (Tenn. 1999).[9]

Dr. William Bernet,[10] a forensic psychiatrist, interviewed the defendant and evaluated his mental status. Dr. Bernet noted that the defendant had three risk factors in his background. The first was a strong history of mental illness on both the maternal and paternal sides of his family. The second was a family history of criminal behavior. The third was the defendant's disturbed and disorganized family life, based on his having a young, unmarried mother, his stepfathers' suicides, frequent moves, a large, complicated household, the custody dispute between his mother and grandmother, and the like. Dr. Bernet indicated that the defendant exhibited some paranoid tendencies, had experienced auditory hallucinations, and was depressed. Dr. Bernet also opined that the defendant had been intoxicated on the day of these crimes, and that all of the above factors had interfered with his judgment in participating in the offenses. Dr. Bernet noted that since the defendant's incarceration, he had been involved in four violent incidents; one, an attack on a fellow inmate, hurt the victim so badly that he was treated in the intensive care ward.

In rebuttal, the State called Dr. Thomas Schacht, a clinical and forensic psychologist. Dr. Schacht had interviewed and tested the defendant. Dr. Schacht opined that prior tests administered to the defendant by another psychologist and relied upon by Dr. Bernet were problematic and potentially invalid. For example, the defendant had exhibited "high inconsistency" on a test to determine if he was malingering. Also, the defendant had been permitted to take the Minnesota Multi-Phasic Personality Inventory in his prison cell and had not completed all the answers; the defendant refused to complete the answers for Dr. Schacht. Another test, the Structure Interview of Reported Symptoms, indicated that the defendant was not reporting his mental symptoms accurately and that there was a fifty to eighty-one percent chance that he was feigning mental illness. Nevertheless, Dr. Schacht conceded that testing indicated that the defendant had some paranoid traits and perhaps even suffered from a paranoid personality disorder. Dr. Schacht described the specifics of the four prior violent episodes in prison, which included, in addition to the above-described assault on the other prisoner, his breaking the sprinkler system in his cell and flooding his unit, creating a disturbance, and threatening and spitting on staff members. Dr. Schacht opined that there was no indication that the defendant was a follower. He also testified that there was no proven genetic relationship to criminal behavior, although a family history of mental illness is a risk factor. In Dr. Schacht's opinion, there was no connection between the defendant's background and the facts of this case.

At the conclusion of the penalty phase, the jury found the existence of three aggravating circumstances: (1) that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person; (2) that

---

[9]The defendant declined to sign a formal acknowledgment of his right to testify and waiver of such right. He confirmed in open court, however, that this was his decision, made after his attorney advised him of this right.

[10]The transcript misspells Dr. Bernet's name as "Burnett." We have confirmed the correct spelling of the name and choose to use it in this opinion despite the error in the record.

the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit robbery or kidnapping. Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (1996). The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed sentences of death for each of the murder convictions.

## II. Analysis

### A. Failure to charge aggravating circumstances in the indictment

The defendant asserts that the indictment in this case is constitutionally defective because it fails to charge the aggravating circumstances relied on by the State to sentence him to death. He argues that such a conclusion is warranted by the United States Supreme Court's holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). Alternatively, the defendant argues that such a finding is required by the due process and notice requirements of the federal and state constitutions and Tennessee statutory law.

We have addressed this same issue on several occasions, most recently in State v. Odom, 2004 WL 1124968, ___ S.W.3d ___, ___ (Tenn. 2004). See also State v. Holton, 126 S.W.3d 845, 862-63 (Tenn. 2004); State v. Carter, 114 S.W.3d 895, 910 n.4 (Tenn. 2003); and State v. Dellinger, 79 S.W.3d 458, 466 (Tenn. 2002). We have consistently rejected the argument that aggravating circumstances must be pled in the indictment, and continue to do so today.

In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Of particular interest is the Apprendi Court's limitation of its discussion to the due process guarantees of the right to trial by jury and the right to have every element of the offense proved beyond a reasonable doubt. The Court expressly noted that no constitutional claim related to the adequacy of the indictment was made, and that the Fourteenth Amendment had not previously been construed to apply the Fifth Amendment right to "presentment or indictment of a Grand Jury" to the states. Id. at 477 n.3.

Following Apprendi, this Court decided Dellinger. In Dellinger, the defendant questioned whether Apprendi's holding required that aggravating circumstances be charged in the indictment. We held that Apprendi's requirements did not apply to Tennessee's capital sentencing procedures because

1. The Apprendi holding specifically excluded from its requirements the prior conviction aggravating circumstance, and this was the only circumstance at issue in Dellinger's case;

-7-

2. The Apprendi holding applied only to enhancement factors used to impose a sentence above the statutory maximum, and under the Tennessee statutory scheme, the death penalty was within the statutory range of punishment;[11]

3. The Apprendi court was concerned about a defendant receiving a sentence beyond what was expected based on the charged offense and the range of punishment, while Tennessee Rule of Criminal Procedure 12.3, which requires notice to a defendant when the death penalty is sought, satisfied the requirements of notice and due process;

4. The Apprendi holding applied to judge sentencing and under the Tennessee capital sentencing scheme, juries, not judges, made the factual findings regarding the existence of aggravating circumstances; and

5. The Apprendi holding required application of "beyond a reasonable doubt" standard for finding enhancement factors, and under the Tennessee capital sentencing scheme, the jury was already required to make its findings of aggravating circumstances "beyond a reasonable doubt."

Based on the distinctions between our capital sentencing scheme and the New Jersey sentencing scheme at issue in Apprendi, we concluded that the principles of Apprendi did not apply to Tennessee capital cases, and did not require that the State charge in the indictment the aggravating circumstances relied upon to support the imposition of a death sentence. Dellinger, 79 S.W.3d at 466-67.[12]

Following our decision in Dellinger, the United States Supreme Court was called on to review Arizona's capital sentencing scheme in Ring v. Arizona. Under the Arizona scheme, although guilt or innocence of capital murder was determined by a jury, the question of presence or absence of aggravating factors required by Arizona law for imposition of the death penalty was determined by a trial judge sitting alone. Relying on Apprendi's holding that the Sixth Amendment required a jury determination of any facts that would expose a defendant to a penalty exceeding the maximum, the Court found Arizona's scheme unconstitutional. Ring, 536 U.S. at 609. The Court expressly held that "Arizona's enumerated aggravating factors operate as 'the functional equivalent

_____

[11]See footnote 14, infra, as to the questioned validity of this particular statement after Ring, 536 U.S. 584.

[12]Instead of stating that the Apprendi principles did not "apply," perhaps it would have been more accurate to state that Apprendi did not "affect" our procedure. The basic constitutional principles of right to trial by jury and right to proof of elements of an offense beyond a reasonable doubt clearly *apply*; they simply were not affected by Apprendi because in Tennessee, our procedure already provided that aggravating circumstances must be submitted to and found by a jury beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204 (1997).

-8-

of an element of a greater offense,' [and] the Sixth Amendment requires that they be found by a jury." Id. (quoting Apprendi, 530 U.S. at 494 n.19).[13]

Again, however, the Supreme Court declined to extend the Fifth Amendment right to presentment or grand jury indictment, and noted that Ring's claim did not address the constitutionality of the indictment. The Court reiterated its statement in Apprendi that the "Fourteenth Amendment has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury.'" Ring, 536 U.S. at 597 n.4 (quoting Apprendi, 530 U.S. at 477 n.3).

The law in this area is still developing. See Blakely v. Washington, 2004 WL 1402697, 542 U.S. ___, ___ (2004) ("the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant"). The holdings in Ring and Blakely do not change our analysis in Dellinger regarding whether aggravating circumstances must be pled in the indictment. The focus in Apprendi, Ring, and Blakely was on the Sixth Amendment right to trial by jury. In both Apprendi and Ring, the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States. Ring, 536 U.S. at 597 n.4; Apprendi, 530 U.S. at 477 n.3. We are unwilling to do what the U.S. Supreme Court would not.[14] Furthermore, we note that the majority of states addressing this question have likewise declined to require the inclusion of aggravating circumstances in the indictment. See Banks v. State, 842 So. 2d 788, 793 (Fla. 2003); Terrell v. State, 572 S.E.2d 595, 602 (Ga. 2002), *cert. denied* ___ U.S. ___, 124 S.Ct. 88 (2003); People v. Davis, 793 N.E.2d 552, 568-70 (Ill. 2002), *cert. denied* 537 U.S. 896 (2002); Soto v. Commonwealth, 2004 WL 867447, ___ S.W.3d ___, ___ (Ky. 2004); Baker v. State, 790 A.2d 629, 650 (Md. 2002), *cert. denied* 535 U.S. 1050 (2002); Stevens v. State, 867 So. 2d 219, 227 (Miss. 2003); State v. Gilbert, 103 S.W.3d 743, 747 (Mo. 2003); Floyd v. State, 42 P.3d 249, 256 (Nev.

---

[13] In discussing the implications of the Apprendi decision to death penalty cases, the Ring majority rejected Arizona's argument that the death penalty was "within the range of punishment authorized by the jury verdict." The Court stated:

> This argument overlooks Apprendi's instruction that "the relevant inquiry is one not of form, but of effect." In effect, "the required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict." The Arizona first-degree murder statute "authorizes a maximum penalty of death only in a formal sense," for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty.

Ring, 536 U.S. at 604 (citations omitted). In light of this language, our statement in Dellinger that "[t]he death penalty is within the statutory range of punishment . . . for first degree murder," 79 S.W.3d at 466, is not entirely accurate.

[14] The defendant argues, and we acknowledge, that in relation to the Federal Death Penalty Act, 18 U.S.C.A. §§ 3591(a)(2), 3592(c), several lower federal courts have held that at least one aggravating circumstance must be pled in the indictment. See United States v. Robinson, 367 F.3d 278, 284 (5th Cir. 2004) (but holding error harmless); United States v. Allen, 357 F.3d 745, 748 (8th Cir. 2004) (en banc); United States v. Higgs, 353 F.3d 281, 298 (4th Cir. 2003); United States v. Haynes, 269 F. Supp. 2d 970, 979 (W.D. Tenn. 2003).

2002), *cert. denied* 537 U.S. 1196 (2003); State v. Hunt, 582 S.E.2d 593, 605 (N.C. 2003), *cert. denied* ___ U.S. ___, 124 S.Ct. 44 (2003); Primeaux v. State, 88 P.3d 893, 899-900 (Okla. Crim. App. 2004); State v. Oatney, 66 P.3d 475, 485-87 (Or. 2003), *cert. denied* ___ U.S. ___, 124 S.Ct. 1148 (2004). But see State v. Fortin, 843 A.2d 974, 1027-38 (N.J. 2004) (requiring inclusion on state constitutional grounds, for prospective application only).

Recognizing the limitations of the Apprendi/Ring holdings, the defendant argues that our own constitutional provision for indictment, Tennessee Constitution article I, section 14[15] mandates that aggravating circumstances be charged in the indictment. We disagree.

The overriding purpose of an indictment is to inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition, Tennessee Code Annotated section 40-13-202 requires that an indictment:

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). This Court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." Id. at 299 (citing State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997)). We have previously held that an indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements of Hill. See State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000) (holding an indictment alleging that the defendant "did unlawfully kill [the victim] during the perpetration of Aggravated Robbery, in violation of Tenn. Code Ann. 39-13-202" sufficient because it contained a specific reference to the statute which was "sufficient to place the accused on notice of the charged offense"); State v. Carter, 988 S.W.2d 145, 148 (Tenn. 1999) (holding that reference to the appropriate statute was sufficient in felony murder indictments alleging that the defendant did "unlawfully kill [the victims] during the perpetration of Aggravated Robbery, in violation of Tenn. Code Ann. 39-13-202"); Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998) (holding that "an indictment which cites the pertinent statute and uses its language will be sufficient to support a conviction").

Despite the language in Apprendi and Ring referring to aggravating circumstances as "the functional equivalent of an element of a greater offense," Ring, 536 U.S. at 609; Apprendi, 530 U.S. at 494 n.19, for purposes of pleading, we view aggravating circumstances as more similar to sentencing enhancements. In Tennessee, the elements of the offense of first-degree murder are: (1)

---

[15]"That no person shall be put to answer any criminal charge but by presentment, indictment or impeachment."

a killing of another with (2) premeditation and (3) intent; *or* (1) a killing of another (2) in the perpetration of certain enumerated offenses; *or* (1) a killing of another (2) by the unlawful throwing, placing or discharging of a destructive device or bomb. Tenn. Code Ann. § 39-13-202 (1996). Proof of these essential elements, *without any proof of an aggravating circumstance*, will support a conviction of first-degree murder. It is only when the state seeks to impose an enhanced sentence of life without parole or death that the aggravating circumstances come into play. Tenn. Code Ann. § 39-13-204(i) (1996).

Accordingly, the primary concern for a defendant charged with first-degree murder is notice that he or she is facing an enhanced sentence of life without parole or death. Such notice is provided for in both the Code and in the Tennessee Rules of Criminal Procedure. Tenn. Code Ann. § 39-13-208 (1996), Tenn. R. Crim. P. 12.3 (1984). Rule 12.3 of the Rules of Criminal Procedure mandates written notice, given at least thirty days prior to trial, of the state's intention to seek the death penalty and of the aggravating circumstances the State intends to rely upon for such enhanced sentence. Section 39-13-208 provides for the same in cases where the State is seeking an enhanced sentence of life without parole.

We have previously held, and we continue to find, that the provisions of Rule 12.3 satisfy the constitutional requirements of notice. See State v. Odom, 2004 WL 1124968 n.13, ___ S.W.3d at ___ n.13; State v. Dellinger, 79 S.W.3d at 467; State v. Bush, 942 S.W.2d 489, 520 (Tenn. 1997); State v. Johnson, 762 S.W.2d 110, 117 (Tenn. 1988). The defendant argues that the decision whether to seek the death penalty and requirement of notice provided by Rule 12.3 is tainted because the State, which ultimately has the discretion whether to seek the death penalty, is an interested party. Allowing a disinterested grand jury to allege the applicable aggravating circumstances, he urges, would be preferable. However, we have held previously that "'[p]rosecutorial discretion used in selecting candidates for the death penalty does not result in any constitutional deprivation.'" State v. McKinney, 74 S.W.3d 291, 320 (Tenn. 2002) (quoting State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994)); State v. Brimmer, 876 S.W.2d 75, 86-87 (Tenn. 1994)). So long as adequate notice and opportunity for hearing is provided for by our statutory scheme, aggravating circumstances need not be included in the indictment.

## B. Application of the Rules of Evidence

The defendant argues that the relaxed standard of proof during the sentencing phase of capital proceedings violates the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution. U.S. Const. amend. V, VI. His complaint goes to that part of Tennessee Code Annotated section 39-13-204(c) (1996) that provides:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or

rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

The defendant urges this Court to invalidate this provision and hold that the Tennessee Rules of Evidence are to be applied strictly to the introduction of evidence in support of aggravating circumstances during capital sentencing hearings.[16]

Under the statute, any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. See State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995). As we noted in State v. Carter, 114 S.W.3d 895, 903 (Tenn. 2003), however,

the statute does not require . . . that the rules of evidence be completely disregarded. The trial court retains its traditional role in controlling the introduction of evidence, and it may continue to use the rules of evidence to guide its decisions regarding admissibility of evidence in capital sentencing proceedings. See State v. Sims, 45 S.W.3d 1, 14 (Tenn. 2001).

In Sims we stated:

[I]n general, § 39-13-204(c) should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing. The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant

---

[16]The defendant relies heavily on the case of United States v. Fell, 217 F. Supp. 2d 469, 487 (D.Vt. 2002), which held that capital sentencing hearings conducted pursuant to the federal death penalty sentencing statute, 18 U.S.C.A. § 3731, must be conducted in accordance with the Federal Rules of Evidence. We note that this holding was recently reversed by the Second Circuit in United States v. Fell, 360 F.3d 135, 141 (2d Cir. 2004) (holding that the statute admitting evidence related to mitigating or aggravating factors "regardless of its admissibility" under the federal evidence rules, do not offend Due Process or Confrontation clauses); see also United States v. Matthews, 246 F. Supp. 2d 137, 142 (N.D.N.Y. 2002)(same).

and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

45 S.W.3d at 14.

We conclude that the evidentiary standards set forth in Tennessee Code Annotated section 39-13-204(c) enable the trial courts to exclude any evidence that is repugnant to the constitutional guarantees of due process, or that would violate a defendant's right to confrontation or cross-examination. Accordingly, those standards do not violate the due process or confrontation clauses of the Fifth and Sixth Amendment.

## C. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that under the facts presented, he is guilty of, at the most, facilitation of the victims' kidnappings, robberies, and murders. He attacks the credibility of the State's "star witness," Antonio Cartwright as "objectively and patently unbelievable." We disagree.

Tennessee Rule of Appellate Procedure 13(e) (1980) ordains that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Upon conviction, the burden of demonstrating why the evidence is insufficient to support the verdict falls upon the convicted criminal defendant, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard for appellate review when a criminal defendant challenges the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

"On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The defendant argues that if he is guilty of anything, it is of facilitation of these crimes. For purposes of the following discussion, we refer to the criminal responsibility statute and the facilitation statute. The criminal responsibility statute provides in pertinent part that

[a] person is criminally responsible for an offense committed by the conduct of another if

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402 (1997). A person found criminally responsible for an offense committed by another is guilty to the same degree as the principal offender. State v. Richmond, 90 S.W.3d 648, 655 (Tenn. 2002); State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001).

To compare, the facilitation statute provides that

[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-403(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code Ann. § 39-11-403(a) (1997). A person found guilty of facilitation of an offense is subject to punishment for an offense one class next below that of the felony facilitated. A defendant's presence, knowledge of, and participation in the crimes charged, clearly raises a question of fact for the jury as to defendant's participation as a principal or a facilitator. See Richmond, 90 S.W.3d at 654-55; Flippen v. State, 365 S.W.2d 895, 898-99 (Tenn. 1963). With these definitions in mind, we proceed to analyze the sufficiency of the evidence of the defendant's participation in each of the convicted offenses.

**1. First-degree Premeditated Murder**

-14-

At the time of these killings, premeditated first degree murder was defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1995). "Premeditation" was defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1995). A conviction for first-degree murder required proof that the killing of another was intended. Intentional conduct refers to a person acting intentionally with respect to a result of the conduct, when it is the person's conscious objective or desire to cause the death of the victim. Tenn. Code Ann. § 39-11-106(a)(18) (1995).

The existence of premeditation is a question of fact for the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Because premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may be inferred from the circumstances surrounding the killing. Holton, 126 S.W.3d at 859; State v. Davidson, 121 S.W.3d 600, 614-15 (Tenn. 2003); Bland, 958 S.W.2d at 660. We have previously identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or concealing of evidence of the killing; and (7) a defendant's calmness immediately after the killing. See Davidson, 121 S.W.3d at 615; State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998); Bland, 958 S.W.2d at 660. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1995); see Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660. One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003).

After reviewing the evidence in the record in the light most favorable to the prosecution, we conclude that the jury's verdict of guilt of premeditated murder is supported by the evidence beyond a reasonable doubt. The jury was in the best position to judge the credibility of the witnesses and to decide whether the defendant acted with the culpability necessary to hold him criminally responsible for the kidnapping, robbery and murder of the victims.

The proof established that the defendant and Davis planned to meet the victims for the purpose of purchasing assault weapons. At some point, they decided to rob the victims instead of paying for the guns. The defendant was overheard participating in this discussion and stating, "If we rob 'em, we gotta kill 'em . . . [b]ecause they know us." The defendant and Davis carried handcuffs, rope and duct tape to their meeting with the victims. The victims were found in a remote location in a state of partial undress. Rope left at the scene indicated that the victims had been bound. Both victims were shot multiple times with two different weapons. When the defendant and Davis returned to Davis's apartment, they had numerous assault weapons and Lee's car. The defendant claimed to a friend that he had killed Ewing because Davis had been unable to do so. The defendant and Davis burned and abandoned Lee's car in a remote location, then spent the night in a motel away from their usual abode. When confronted by police the next day, both Davis and the defendant fled. Following the defendant's arrest, he admitted to being at the scene. In light of this evidence, we conclude that a reasonable juror could have found the defendant guilty of the first degree premeditated murders of Ewing and Lee based upon either his own conduct or under a theory of criminal responsibility for the conduct of his co-defendant, or both. We agree with both courts below that the evidence does not support a finding that the defendant was guilty merely of facilitation.

Insofar as the credibility of Antonio Cartwright is concerned, that was strictly a question for the jury. The jury chose to accredit Cartwright's testimony over the statement of the defendant, as was its prerogative.

**2. First-degree Felony Murder and Especially Aggravated Robbery**

At the time this offense was committed, felony murder was defined as "a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1995). No culpable mental state was required for conviction of felony murder "except the intent to commit the enumerated offenses . . . ." Tenn. Code Ann. § 39-13-202(b) (1995). Robbery was defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1995). In order for a person to be convicted of "especially aggravated robbery," the state was required to prove that the robbery was accomplished with a deadly weapon *and* the victim must have suffered serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (1995).

The evidence in this case showed that the defendant and his cohort openly discussed robbing and murdering the victims in the hours before acting on their intentions. The defendants were seen

later in possession of the victims' car, jewelry, clothing, and weapons. Both victims were shot to death with firearms. Based on this evidence, the convictions for especially aggravated robbery and felony murder are amply supported by the evidence beyond a reasonable doubt.

### 3. Especially Aggravated Kidnapping

At the time of these offenses, kidnapping was defined as false imprisonment, i.e., the knowing removal or confinement of another unlawfully so as to interfere substantially with another person's liberty, under circumstances exposing the other person to a substantial risk of bodily injury. Tenn. Code Ann. §§ 39-13-302(a), -303(a)(1) (1991). A kidnapping was "especially aggravated" under section 39-13-305 if accomplished with a deadly weapon or if the victim suffered serious bodily injury. Tenn. Code Ann. § 39-13-305(a)(1), (4) (1991).

The evidence showed that the defendant and Davis left Davis's apartment carrying a bag that contained handcuffs, rope and duct tape. There is evidence, including the defendant's own statement, that the victims were bound and transported to the construction site where their bodies were eventually found. Rope found at the murder scene was further evidence that the victims had been bound. While the evidence is unclear as to which defendant was actually responsible for binding the victims, what *is* clear is that the defendant played an active role in planning, preparing, and executing the kidnapping, robbery and murder of the victims. The evidence is certainly sufficient to support a finding of guilt beyond a reasonable doubt of especially aggravated kidnapping under at *least* a theory of criminal responsibility.

### D. Speedy Trial

The defendant alleges that the two-year delay between his indictment in May 1996 and the State's filing of notice of intent to seek the death penalty in November 1998, and the four-year delay between his indictment and his trial in May 2000, violated his right to a speedy trial under the Sixth Amendment to the United States Constitution. Specifically, he asserts that the delay caused him to endure a long pre-trial incarceration, that he suffered anxiety and concern over the pending charges, that he was hampered in his preparation of a death defense, and that the delay enabled the State's "star witness," Antonio Cartwright, to "craft" his testimony to "make it most favorable to [himself] and most damaging to Defendant."

The record reflects the defendant did not file a motion in the trial court requesting a speedy trial, did not move to dismiss the indictment for failure to provide a speedy trial, and did not assert the denial of a speedy trial as a reason for relief in his motion for new trial. Despite his procedural failures, the defendant asserts that the delay constituted "plain error" that should be remedied by this Court. He does not specify the remedy he seeks for such error. Presumably, he seeks reversal of the convictions and dismissal of the indictments. See State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973).

Both the United States and Tennessee Constitutions guarantee the criminal defendant the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; State v. Utley, 956 S.W.2d 489,

492 (Tenn. 1997). The right to a speedy trial is also statutory in Tennessee. See Tenn. Code Ann. § 40-14-101 (2003). In addition, the Tennessee Rules of Criminal Procedure provide for the dismissal of an indictment, presentment, information or criminal complaint "[i]f there is unnecessary delay in presenting the charge to a grand jury against a defendant who has been held to answer to the trial court, or if there is unnecessary delay in bringing a defendant to trial . . . ." Tenn. R. Crim. P. 48(b). These guarantees were designed "to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." Utley, 956 S.W.2d at 492 (citing Doggett v. United States, 505 U.S. 647, 654 (1992)). "The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997).

In determining whether a defendant's right to a speedy trial has been compromised, four factors must be weighed: the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and any prejudice to the defendant caused by the delay. Barker v. Wingo, 407 U.S. 514, 530 (1972); State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001); Utley, 956 S.W.2d at 492; Bishop, 493 at 83-84. The most important question, although not determinative in every case, is whether the delay caused any prejudice to the defendant. Simmons, 54 S.W.3d at 760; State v. Carico, 968 S.W.2d 280, 285 (Tenn. 1998). "[P]rejudice [is] the single most important factor in the balancing test," and the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense. State v. Baker, 614 S.W.2d 352, 356 (Tenn. 1981). However, it is not necessary for a court to consider these factors unless there has been "some delay which is presumptively prejudicial." Barker, 407 U.S. at 530; see also Doggett, 505 U.S. at 651-52 n.1. "[S]uch a delay must approach one year to trigger" an analysis of the remaining factors, Utley, 956 S.W.2d at 494; see also Vickers, 985 S.W.2d at 5, although "the line of demarcation depends on the nature of the case," Utley, 956 S.W.2d at 494.

The Court of Criminal Appeals noted that the failure to raise this issue in the trial court, either through motion for speedy trial, motion to dismiss, or in the Motion for New Trial could result in waiver of the issue. Tenn. R. App. P. 3(e). The court addressed the issue nevertheless because of the heightened review accorded death penalty cases. After applying the four-part balancing test of Barker v. Wingo, however, the court concluded that while the length of the delay in this case was presumptively prejudicial, meaningful review was impossible because without an evidentiary hearing in the trial court, neither the reason for the delay nor prejudice could be accurately ascertained. We agree.

The four-year delay in bringing this case to trial triggers the four-part Barker v. Wingo analysis. However, the length of the delay alone will not support a finding of a speedy trial violation. See State v. Wood, 924 S.W.2d 342, 349 (Tenn. 1996) (thirteen (13) year delay did not result in denial of the right to a speedy trial). The court must consider the other three factors – reason for the delay, the defendant's assertion of the right, and actual prejudice suffered – to make a determination whether the right to a speedy trial was unconstitutionally breached. Id. at 346.

The defendant argues that the length of the delay shifts the burden to the State to prove a valid reason for the delay, and the State's failure to affirmatively explain its failure to proceed to a speedy resolution of the case proves fatal. In this case, the defendant's own failure to raise the issue is the cause for the absence of any evidentiary proceedings in the trial court. We find that this failure precludes a finding that the reason for delay should be held against the State. To hold otherwise would be to ignore the final two factors mandated for consideration by <u>Barker v. Wingo</u>: the defendant's assertion of the right and prejudice. The defendant's failure to assert his right to a speedy trial is evidence of his waiver of such right. Furthermore, his allegations of prejudice are unsupported by the record. The bare allegation that the delay affected his ability to prepare a defense is unsupported by any specific examples. Furthermore, the contention that the delay allowed Antonio Cartwright to fabricate his testimony is also made without any reference to proof in the record. And finally, any allegation as to the anxiety and stress suffered from his incarceration during this delay is minimized by evidence that he was also incarcerated awaiting trial for two other crimes unrelated to the crimes involved here. Certainly, if there was any additional stress and anxiety, at least some of it would be attributable to his incarceration for the unrelated offenses. To summarize our position, we hold that while the length of the delay is presumptively prejudicial, the defendant's failure to assert his right to a speedy trial and the lack of prejudice support a finding of no error.

## E. Mandatory Review Factors

Tennessee Code Annotated section 39-13-206(c)(1) requires that courts reviewing a sentence of death for first degree murder determine whether:

> (A) the sentence of death was imposed in any arbitrary fashion; (B) the evidence supports the jury's finding of statutory aggravating circumstance or circumstances; (C) the evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and (D) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

First, we find that the sentencing hearing in this case proceeded according to the established statutory and regulatory procedures outlined in the Code and in the Rules of Criminal Procedure. Tenn. Code Ann. § 39-13-204; Tenn. R. Crim. P. 12.3, 32. Moreover, a thorough review of the record reveals that the evidence is sufficient to support the jury's finding of the aggravating circumstances beyond a reasonable doubt. The evidence indisputably supports aggravating circumstance (i)(2), that the defendant was previously convicted of one or more felonies that involved the use of violence to the person. Tenn. Code Ann. § 39-13-204(i)(2) (1996). The defendant does not dispute that at the time of this trial, he had valid convictions of first-degree murder, two aggravated robberies, and aggravated assault. Circumstance (i)(6), that the murder was committed for the purpose of avoiding prosecution, is supported by the defendant's own statements prior to the murders that if they robbed the victims, they would have to kill them because the victims knew who they were. Tenn. Code Ann. § 39-13-204(i)(6) (1996). Finally, circumstance (i)(7), that the murder was committed during the commission of a felony, is supported by the evidence that the

victims were kidnapped and robbed before they were killed. Tenn. Code Ann. § 39-13-204(i)(7) (1996).

We further conclude that the evidence was sufficient to support the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. In determining whether the evidence supports the jury's finding, the proper standard is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. See State v. Carter, 114 S.W.3d 895, 908 (Tenn. 2003); State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 661 (Tenn. 1997). The evidence is sufficient to support the jury's decision that the three aggravating circumstances outweighed the various mitigating circumstances presented by the defendant beyond a reasonable doubt. Given his multiple prior convictions for violent crimes against the person, as well as the advance, cold-blooded planning to eliminate the victims as witnesses after the robbery, a rational juror could have found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

Finally, we are obligated by Tennessee Code Annotated section 39-13-206(c)(1)(D) to conduct a review of this case to determine whether the sentence of death is disproportionate to the penalty imposed in similar cases. This "comparative proportionality review" is designed to identify aberrant, arbitrary or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." Bland, 958 S.W.2d at 662. It involves a comparison of this case to cases involving similar defendants and similar crimes. Id. at 668. Only those cases in which a capital sentencing hearing was conducted are used for comparison. State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). Comparative proportionality review begins "with the presumption that the sentence of death is proportional with the crime of first degree murder." Carter, 114 S.W.3d at 908.

In making this comparison, we consider numerous factors regarding the particular defendant, including: "(1) prior criminal record; (2) age, race and gender; (3) mental, emotional and physical condition; (4) [the level of involvement or] role in the murder; (5) cooperation with authorities; (6) [the] level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001), *cert. denied* 534 U.S. 998 (citing Bland, 958 S.W.2d at 667). Other factors relevant for consideration are: (1) the aggravating and mitigating circumstances, (2) the means, manner and place of death, (3) the motivation for the killing, (4) the victim's age, physical condition and psychological condition, (5) the absence or presence of provocation, (6) the absence or presence of premeditation, (7) the absence or presence of justification, and (8) the injury to and effect on non-decedent victims. Id. There is no mathematical formula or scientific means for making the comparison, and no two cases are exactly alike. Terry v. State, 46 S.W.3d 147, 164 (Tenn. 2001). Our function is not to identify perfectly identical cases, but "to identify and to invalidate the aberrant death sentence." Id. (quoting Bland, 958 S.W.2d at 665).

In this case, the following facts are pertinent: the defendant and Davis set up a meeting with the victims planning to kidnap, rob and murder them. The defendant expressed an intent to kill the victims in order to avoid being identified. Armed with guns and equipped with handcuffs, rope and duct tape, the defendant and his cohort kidnapped and restrained the victims. They then transported the victims to a remote site where they forced the victims to disrobe and then repeatedly shot the victims. The defendant fled the scene in Lee's car, taking the victims' rifles, clothing, jewelry and shoes. When confronted by police the following day in an unrelated matter, the defendant fled and managed to evade capture for almost a week. When apprehended, the defendant did not cooperate, but gave a self-serving statement in which he blamed the co-defendant for the murders.

The defendant, an African-American male, was nineteen years old at the time he committed these offenses. He was a high school dropout with no visible means of support. Although single, he had fathered a son who was born after his arrest. He had four prior convictions for violent felonies at the time of his conviction for these offenses. The victims, ages eighteen and nineteen at the time of their deaths, were neighborhood acquaintances of the defendant. The killings were perpetrated during robberies and kidnappings of the victims, and the defendant committed the murders to keep the victims from identifying him as the perpetrator of a robbery he planned to commit. The defendant never expressed remorse for his crimes.

In mitigation, proof was presented of the defendant's somewhat disorganized family life. Neither of his parents raised him due to mental health and substance abuse problems. The defendant's father was incarcerated for a robbery conviction for ten years of the defendant's childhood. The defendant was raised in his grandmother's home with several siblings, aunts, and uncles.

Based upon an exhaustive review of the record and Supreme Court Rule 12 reports from trial judges in trials for first degree murder, we conclude that the death sentence is not disproportionate to the penalty imposed in similar cases. For purposes of comparison, we considered the following cases as similar to this case. State v. Powers, 101 S.W.3d 383 (Tenn. 2003) (defendant kidnapped the victim and drove her to an abandoned house where, after robbing her of her money and jewelry, he shot her in the head; death sentence based upon the (i)(2), (6) & (7) aggravating circumstances); State v. Stout, 46 S.W.3d 689 (Tenn. 2001) (defendant kidnapped the victim and took her to an isolated area where he and co-defendants robbed her and shot her in the head; death sentence based upon (i)(2), (6) & (7) aggravating circumstances); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (defendant shot the victim in the head and back during a robbery; death sentence based on the (i)(2) aggravating circumstance); State v. Howell, 868 S.W.2d 238 (Tenn. 1993) (defendant shot a convenience store clerk in the head and took money from the store; death sentence based upon the (i)(2) & (7) aggravating circumstances); State v. Bates, 804 S.W.2d 868 (Tenn. 1991) (defendant escaped from jail, kidnapped the victim, took her to a wooded area where he bound and gagged her before shooting her in the head and stealing her car and traveler's checks; death sentence based upon the (i)(2), (6) & (7) aggravating circumstances); State v. King, 718 S.W.2d 241 (Tenn. 1986) (defendant kidnapped the victim and drove her to a remote location where he shot her in the head, taking her car and money; death sentence based on the (i)(2), (6) & (7) aggravating circumstances);

State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985) (defendant robbed and killed two drug dealers during a fake drug deal he had arranged in an isolated area; death sentence based on the (i)(5) & (7) aggravating circumstances); State v. Matson, 666 S.W.2d 41 (Tenn. 1984) (defendant shot and killed convenience store clerk during robbery; death sentence based on the (i)(2) aggravating circumstance); State v. Harries, 657 S.W.2d 414 (Tenn. 1983) (defendant shot and killed convenience store clerk during robbery; death sentence based on the (i)(2) aggravating circumstance); State v. Coleman, 619 S.W.2d 112 (Tenn. 1981) (defendant shot and killed the victim who was going to the grocery store; death sentence based on the (i)(2) & (7) aggravating circumstances). We also note that the jury in co-defendant Christopher Davis's case imposed the death penalty for his role in these murders. State v. Christopher Davis, 2004 WL 1523277, ___ S.W.3d ___ (Tenn. 2004) (death sentence based on the (i)(2), (6) & (7) aggravating circumstances)(unpublished opinion).

The defendants in each of the above-cited cases murdered victims during the course of a robbery. In each case, the defendant's criminal history reflected at least one prior felony involving violence against the person. While no two capital cases are identical, we have compared the circumstances of the present case and the present defendant with the circumstances of the cases set out above, and those individual defendants, and conclude that this case is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed. Thus, the defendant's sentences of death are not disproportionate considering the circumstances of the crime and the defendant.

### III. Conclusion

After considering the entire record in this case and all the defendant's assignments of error, we conclude that none has merit. Furthermore, we find that the sentences of death were not imposed in any arbitrary fashion, that the sentences of death are not excessive or disproportionate, and that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. With respect to issues not specifically addressed within this opinion, we affirm the decision of the Court of Criminal Appeals, authored by Judge David Hayes and joined by Judges Jerry L. Smith and John Everett Williams. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentences of death shall be carried out as provided by law on the first day of February, 2005, unless otherwise ordered by this Court or other proper authority.

It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE