# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 1, 2013

## JASON McCALLUM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dyer County**
**No. 9-CR-142   R. Lee Moore, Jr., Judge**

_____

**No. W2012-02549-CCA-R3-PC  - Filed January 17, 2014**

_____

The Petitioner, Jason McCallum, appeals the Dyer County Circuit Court's denial of his petition for post-conviction relief from his 2010 conviction for sale of one-half gram or more of methamphetamine in a drug-free school zone and his eighteen-year sentence.  The Petitioner contends that he received the ineffective assistance of counsel.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Milly Worley, Dyersburg, Tennessee, for the appellant, Jason McCallum.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Renee M. Creasy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court's opinion in the appeal of the Petitioner's conviction provided the following regarding the evidence:

> At his trial, Sergeant Todd Thayer with the Dyersburg Police Department testified that he worked in the Narcotics Unit and that he used confidential informants to build cases against those who sold drugs.  Sergeant Thayer described the procedures the unit used to develop and work with confidential informants and explained how controlled drug buys were conducted.

Sergeant Thayer testified that the informant used in the defendant's case was an individual Sergeant Thayer had arrested for selling cocaine and who agreed to work with the police to avoid prosecution on drug-related charges pending against him. He had worked as a confidential informant for over a year and had "made more than fifty undercover cases . . . probably closer to 60, 70 cases."

Sergeant Thayer testified that in October 2008, the informant called and told him that he had arranged to buy $200 worth of methamphetamine from the defendant. Sergeant Thayer met with the informant and placed an audio transmitter and video recorder on his person and supplied him with the "buy money." The informant's person and vehicle were searched to make sure he had no other money, illegal narcotics, or weapons in his possession. The informant then made several calls to the defendant's number, and eventually the defendant called back and the call was recorded. The officers and the informant left their meeting spot, with the officers driving behind the informant in an undercover car. The informant drove to the defendant's residence on East College Street in Newbern, and the officers parked out-of-sight across the street where they listened to the transaction over the audio equipment.

Sergeant Thayer testified that after the transaction was completed, the officers met the informant at the meeting location and the informant turned over the methamphetamine. The informant's person and vehicle were also searched again. Sergeant Thayer identified the evidence package that contained the methamphetamine he recovered from the informant on October 14, 2008. Sergeant Thayer stated that after the defendant was arrested, he and Investigator Chris Gorman met with the defendant and his attorney at the Dyer County Sheriff's Department, and the defendant "admitted to selling the substance to [the informant] on that date."

On cross-examination, Sergeant Thayer acknowledged that during his meeting with the defendant and the defendant's counsel, the defendant insisted that "the stuff [he] sold [the informant] wasn't meth." Sergeant Thayer acknowledged that he had never arrested an African-American for making methamphetamine, but officers had "bought meth from several African[-] Americans . . . in undercover buys." Sergeant Thayer stated that the informant's prior drug charges were cocaine-related and not methamphetamine-related.

Thomas Langford, a property evidence technician/investigator with the Dyersburg Police Department, testified that he handled the evidence in this case. He established the chain of custody, including his removing the evidence from the storage locker and taking it to the Tennessee Bureau of Investigation ("TBI") Lab in Memphis. After the evidence was returned from the TBI Lab, Langford opened the evidence package in the presence of an investigator from the public defender's office to retrieve a sample to mail to a private lab for independent testing. On cross-examination, Langford testified that it was not routine to have independent testing done, and, in fact, this was "the first time [he had] seen it done."

Investigator Chris Gorman with the Dyer County Sheriff's Department testified that he assisted Sergeant Thayer with the defendant's case. Investigator Gorman stated that he met with the informant prior to the transaction and set up the monitoring equipment in the informant's vehicle. He also searched the informant's vehicle beforehand to ensure that no contraband or money was present. After the transaction had been completed, Investigator Gorman searched the informant's vehicle again and removed the monitoring equipment. Investigator Gorman field-tested the substance once he and Sergeant Thayer returned to the police station, and "[i]t came back positive for methamphetamine." On cross-examination, Investigator Gorman acknowledged that during the meeting with the defendant and his counsel, the defendant insisted that the substance he sold "was not real."

The confidential informant testified about his criminal background and his decision to work as an informant. He knew the defendant "briefly through school" and recalled that, sometime in October 2008, he "bumped into [the defendant] at a store and [they] exchanged conversation." During this conversation, the defendant asked the informant if he could get him some cocaine and informed the informant that "he messed with meth . . . if [they] could trade out[.]" The defendant then gave the informant his phone number.

On October 14, 2008, the defendant informed the informant that "he was running short and if [the informant] wanted . . . what . . . [they] had talked about then [he] probably needed to come get it." The defendant told the informant that he had "an eight ball," or "[t]hree grams," of methamphetamine, but that "he was running short and it wasn't a whole eight ball." After this conversation, the informant contacted Sergeant Thayer and Investigator Gorman and met with them to prepare for the drug buy from the defendant.

The informant testified that he called the defendant while in the officers' presence, but the defendant did not answer his phone. However, the defendant called the informant back, and the informant "asked him was he still, was he ready for me. And he replied yes and we was to go do business." The officers recorded the conversation, and the audio was played for the jury.

After the phone call, the informant went to 117 College Street in Newbern, and the defendant approached the passenger's side of his vehicle and "handed [the informant] the meth and [the informant] handed [the defendant] $200." The informant then returned to the "meeting spot" where he met the officers and they turned off the equipment and "g[ot] the package." The video of the transaction was played for the jury. The informant identified the bag of the substance that he received from the defendant.

On cross-examination, the informant admitted that he had previously sold cocaine to the defendant's ex-wife. The informant acknowledged that the package of substance the defendant sold him looked unusual. However, he elaborated on redirect that it looked unusual because he had never "deal[t] with meth" and only seen it on less than five occasions.

Special Agent Dana Parmenter, a forensic scientist with the TBI Crime Lab, testified that she analyzed the evidence submitted in this case and determined that it weighed 1.6 grams and contained methamphetamine, a Schedule II controlled substance.

Carmen Cupples testified that he managed the Geographic Information System ("GIS") for the City of Dyersburg. Cupples used the GIS system to produce a map of 117 East College Street. The map showed that the address was "across the intersection" from Newbern Elementary School. Cupples said that the distance between the property lines of the two locations was 145 feet. On cross-examination, Cupples admitted that he never went out and personally measured the distance between the school and the location where the transaction occurred.

On redirect examination, Cupples explained that the mapping system was based on an aerial photograph and that the system met the National Mapping Accuracy standards of having a horizontal accuracy of two to three feet. He noted that there was a system of checks and balances in place to ensure the accuracy of the system. Cupples said that he had frequently been by Newbern Elementary School. He testified that he had drawn a line on the

map showing the College Street address to the school. The line showed the distance from the property boundary of the residence to the corner of the school building as 435 feet. The measurement between the physical structure at 117 East College Street to the structure of the elementary school was 390 feet.

Testifying on behalf of the defense, Amanda McCallum, the defendant's wife, testified that she came home from work on October 14, 2008, and saw her prescription bottle for Prozac sitting empty on the dresser and "broken capsules" lying around. When she asked the defendant about her pills, he responded that he had used them to make some money. Mrs. McCallum asked the defendant how the pills made him money, and he explained that he "took [her] Prozac and . . . mixed it with fingernail polish remover . . . [and] sold it." Mrs. McCallum and the defendant argued, and she told him that his actions were "irresponsible," but the defendant stated, "I've gotta make money somehow."

The defendant testified that he saw the informant while pumping gas at a gas station. The defendant did not recognize the informant, but the informant recognized him and they began talking. The informant asked the defendant when he had gotten out of prison and "if [he] was still messing with meth." The defendant thought that the informant's question was odd because they had never had prior drug dealings and "[t]here just ain't very many African Americans . . . messing with meth."

The defendant testified that his ex-wife and the informant were friends, and the informant had previously sold "her fake crack and stuff like that, [so the defendant] figured it was [his] chance to get [the informant] back." The defendant told the informant that he could get some methamphetamine and suggested that, if the informant could get some cocaine, they could "do some swapping out." The informant told the defendant that he would call him when he got paid or "he got his hand on some dope."

The defendant testified that the informant called him a few days later asking if the defendant "could . . . still get that," and the defendant told the informant that he could. The defendant explained, however, that he did not have any methamphetamine, so he had to think of a way to "make that $200 . . . or make that cocaine or whatever he had." He elaborated that he "just wanted to get high or get some money to get high." The defendant looked

around the house, found the Prozac, opened the capsules, and put the contents in a baggie. He realized the color would never pass for methamphetamine.

The defendant testified that the informant "kind of stalled . . . for about thirty, forty[-]five minutes," but then called back and asked the defendant if he "still ha[d] it." The defendant was suspicious but went ahead with the transaction because he "didn't know it was illegal to sell Prozac." The defendant stated that he was aware that the State's lab test and the independent test obtained by defense counsel "[s]aid [the substance] was methamphetamine." However, the defendant thought "[t]here's no way Prozac can test as methamphetamine." The defendant denied selling methamphetamine to the informant.

*State v. Jason R. McCallum*, No. W2010-01075-CCA-R3-CD, slip op. at 1-5 (Tenn. Crim. App. May 5, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011).

A Dyer County Circuit Court jury convicted the Petitioner of sale of one-half gram or more of methamphetamine within a drug-free school zone, and he was sentenced to eighteen years. This court affirmed the conviction. *Id.*, slip op. at 1.

At the post-conviction hearing, counsel testified that he met with the Petitioner before they met with the police investigators, that the meeting occurred three years previously, and that he did not remember what he told the Petitioner before the meeting. He did not remember if he cautioned the Petitioner about making statements to the investigators regarding his case or what he said to the Petitioner before the meeting. He said they were at the jail because the Petitioner wanted to be an informant and provide information about a jailer who was bringing narcotics into the jail. He said that one of the investigators was an investigator in the Petitioner's case but that they were to discuss whether the Petitioner would be an informant. Upon questioning by the trial court, counsel testified that a jailer was bringing narcotics into the jail and that the Petitioner and his wife wanted to assist the investigators in exposing the jailer to help the Petitioner's case.

Counsel testified that the investigators did not read the Petitioner his *Miranda* rights because he was not there to discuss his case. He did not believe the investigators asked questions about the Petitioner's case. He said that the Petitioner made one spontaneous statement concerning his case, in which he told Investigator Thayer, "You know that stuff I sold him wasn't meth." He said that he asked Investigator Thayer about the statement during cross-examination to show the Petitioner's mental state, which was that he did not believe he sold methamphetamine, and that Investigator Thayer testified that the Petitioner made the statement. He did not remember advising the Petitioner before the meeting not to

make statements regarding his case. He believed the Petitioner initiated the conversation with investigators hoping to help his case. He said no agreement was made before the meeting about what, if anything, the Petitioner would gain by being an informant.

Counsel agreed that he knew the Petitioner did not believe he sold methamphetamine and stated that the Petitioner consistently said the substance he sold was not methamphetamine. He said that to develop a defense about the substance not being methamphetamine, he examined the TBI test results and made an *ex parte* motion for expert funds to have an independent agency analyze the substance. He said that after the motion was granted, a private company in Columbus, Ohio, analyzed the substance. He denied talking to a chemist but said he asked a local pharmacist if the ingredients the Petitioner claimed he used could produce a false positive in a methamphetamine analysis. He said the pharmacist told him there was "no way" the ingredients could produce a positive result. He believed the Petitioner said he used Prozac and nail polish remover. He did not know the ingredients in nail polish remover and denied he and the pharmacist discussed how the acetone in nail polish remover would bond with the ingredients in Prozac. He denied the Petitioner wavered before the trial about what the substance was.

Counsel testified that he sent his investigator to the area of the drug transaction to determine if an issue existed concerning the distance between the transaction and the school. He said the investigator told him there was no issue. He said he objected to the trial testimony concerning the distance, which was sustained.

Upon questioning by the trial court, counsel testified that the independent laboratory test showed the substance was methamphetamine. He said the results were not used at the trial.

On cross-examination, counsel testified that he did not recall if he received the Ohio laboratory's results before the meeting with investigators. He agreed the Petitioner initiated the meeting with the investigators and thought the Petitioner approached him about the meeting. He said the Petitioner was not promised anything as a result of the meeting. He said that the Petitioner testified at the trial that he combined Prozac and nail polish remover and that the Petitioner's wife testified her Prozac was missing around the time of the transaction. He said, though, he shared the Ohio laboratory's results with the Petitioner. He said that he imagined he told the Petitioner about his discussion with the pharmacist and that he disclosed all the information to the Petitioner.

Counsel testified that he and the Petitioner met with Investigators Thayer and Cantu, although he was not positive. He said that he had no reason to believe the meeting was to discuss the Petitioner's case and that when he talked to the investigators, the conversation

-7-

concerned the jailer bringing narcotics into the jail. He believed the Petitioner randomly made the comment to Investigator Thayer in the hallway on the way to the meeting room but was not sure how it happened because it had been three years.

Counsel testified that he and the Petitioner discussed the fact that the drug transaction was in a drug-free school zone, making the crime a Class A felony with a possible fifteen- to twenty-five-year sentence, and that the Petitioner understood and wrote a letter to him about it. He agreed that the drug-free zone was 1000'. He agreed that a photograph was admitted at the trial showing the distance between the school and the location of the transaction and that he objected to the distance shown because it was allegedly from property line to property line. He agreed the photograph was admitted after the State showed the distance was from structure to structure, which was "well under" 200'. He denied he could have developed a defense that the transaction was not within 1000' of a school zone. He said the only thought he had was to exclude entirely the testimony concerning distance because it was "obviously" within 1000'.

The Petitioner testified that he was represented by counsel and that he and counsel spoke before he met with the investigators. He said they discussed his charges and the status of his case. He denied that counsel cautioned him about talking to the investigators about his pending case. He said that he talked to counsel about working for the police in an attempt to obtain leniency in his case and that the meeting with investigators was to discuss the possibility. He said he was never told not to discuss his pending case nor read his rights. He said that when he met with the investigators, they first discussed what type of work he could perform for them and what he could give them. He said that after the initial discussion, he was "lured into conversation" and told the investigators that he was not guilty of the crimes with which he was charged and that the substance he sold was not methamphetamine. He did not remember if the investigators discussed his statement or followed it with questions. He said that during the interview, he looked to counsel for approval to talk and that Investigator Gorman told him the meeting was "off the record." He denied that counsel told him the meeting was not off the record and said he did not know what that meant.

The Petitioner testified that he and counsel discussed the drug-free zone issue, how to challenge it, and what it would mean if he were convicted. He said he first heard at the post-conviction hearing that counsel sent an investigator to view the distance. He said counsel did not discuss with him counsel's conversation with the pharmacist.

The Petitioner testified that counsel discussed with him the results from the independent laboratory's testing, which showed the substance was methamphetamine. He told counsel he did not understand how the results were positive for methamphetamine. He said that after he received the results, his wife received a prescription for Prozac and that he

read the prescription warning label and tried to give it to counsel, who would not accept it. He said he did not remember his exact conversation with counsel but knew he showed counsel that antidepressants contained amphetamines. He said counsel told him it did not matter because the substance he sold tested positive for methamphetamine.

On cross-examination, the Petitioner agreed that during the time he was represented by counsel, he never contended he did not sell something, only that it was not methamphetamine. He acknowledged that his defense was that the substance he sold was not methamphetamine and that he never told the investigators that the substance was methamphetamine. He agreed, though, that the TBI report and the independent laboratory analysis showed a positive methamphetamine reading.

In denying the petition, the trial court found no proof showing that counsel failed to advise the Petitioner of the elements of the charges against him. The court noted that even if counsel failed to advise the Petitioner of the consequences of meeting with the investigators, he did not prove he was prejudiced. The court stated that the evidence showed the Petitioner initiated the meeting with the investigators and found that the allegation of a coerced confession did not appear to be true factually. The court noted counsel and the Petitioner agreed that the Petitioner's statement was that the substance sold was not methamphetamine. The court found that no evidence supported a violation of the Petitioner's privilege against self-incrimination and that *Miranda* rights were not relevant to the situation because no interrogation occurred. The court stated that counsel did everything he could to develop the Petitioner's defense that the substance sold was not methamphetamine, including requesting independent testing and consulting a pharmacist, and to investigate whether the transaction's location was within a drug-free school zone. The court noted it was the Petitioner's burden to show counsel's performance was deficient to the extent he did not receive a fair trial and found that the Petitioner did not meet his burden. This appeal followed.

The Petitioner contends that he received the ineffective assistance of counsel. He argues that counsel failed to advise him of the elements of the charge against him, preventing him from making a knowing and intelligent decision whether to plead guilty. He argues that counsel failed to advise him of the possible consequences of meeting with investigators and failed to ensure the investigators advised him of his *Miranda* rights during their meeting, meaning his conviction was based on a violation of his privilege against self-incrimination. He also argues that counsel failed to develop a defense to the results of the TBI report and call witnesses in support of the defense and failed to develop a defense to the drug-free school zone location. The State counters that the Petitioner received the effective assistance of counsel. We agree with the State.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

Regarding the Petitioner's argument that counsel failed to advise him of the elements of the charge against him, the Petitioner testified that he and counsel discussed his charge and what was happening with his case. Counsel testified that he and the Petitioner discussed that the drug transaction was in a drug-free school zone and that the Petitioner faced a possible fifteen- to twenty-five-year sentence. The trial court found no proof showing that counsel failed to advise the Petitioner of the elements of the charge. Nothing in the record preponderates against the trial court's findings.

Regarding the Petitioner's argument that counsel failed to advise him of the possible consequences of meeting with investigators, counsel did not remember if he cautioned the

Petitioner about making statements to the investigators regarding his case or what he said to the Petitioner before the meeting. The Petitioner denied that counsel cautioned him about talking to the investigators. Although the meeting was to discuss the Petitioner's acting as an informant for another case, not to discuss his pending charge, it would have been advisable for counsel to warn the Petitioner of the dangers of discussing his case with investigators, particularly because one of the investigators was working on his case. However, the trial court found that even if counsel failed to advise the Petitioner of the consequences of meeting with the investigators, the Petitioner had not proven prejudice. The court noted that counsel and the Petitioner agreed the Petitioner's statement was that the substance he sold was not methamphetamine. The record shows that throughout the trial, the Petitioner maintained the defense that the substance was not methamphetamine, not that he did not sell anything. The Petitioner's comment supported his defense, and he was not prejudiced by counsel's failure to warn him of the dangers of discussing his case with the investigators.

Regarding the Petitioner's argument that counsel failed to ensure the investigators advised him of his *Miranda* rights during their meeting, the United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody and under state-initiated interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. *See Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court limited its holding to situations involving "custodial interrogation," which it defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. *Miranda* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted). However, "questioning initiated by the accused is not interrogation in the *Innis* sense." *State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)).

The record shows that the Petitioner initiated the conversation with investigators and provided the comment spontaneously in the hallway before the interview began, not at the request of investigators. *See Land*, 34 S.W.3d at 524 ("There is no constitutional protection from statements volunteered by the accused."). The trial court found that the evidence showed the Petitioner initiated the meeting, that the allegation of a coerced confession did not appear to be true factually, that no evidence supported a violation of the Petitioner's privilege against self-incrimination, and that *Miranda* rights were not relevant to the situation

because no interrogation occurred. We conclude that *Miranda* warnings were not required because the Petitioner was not subjected to "interrogation in the *Innis* sense" when he initiated the meeting. *Land*, 34 S.W.3d at 524. Counsel was not deficient in failing to ensure the investigators read the Petitioner his rights. The issue is without merit.

Regarding the Petitioner's argument that counsel failed to develop a defense to the TBI test results and to call witnesses in support of the defense, the records shows that counsel requested funding for independent testing of the substance, that the request was granted, and that the substance was sent to an independent laboratory for analysis. Analyses from the TBI and the independent laboratory showed the substance was methamphetamine. Counsel also consulted a pharmacist about the possibility of a false positive result, which the pharmacist said was not possible. Nothing in the record preponderates against the trial court's findings that counsel adequately investigated the defense.

Regarding the Petitioner's argument that counsel failed to develop a defense to the drug-free school zone location, counsel testified that the drug-free zone was 1000' and that a photograph was admitted at the trial showing the distance between the school and the location of the transaction was "well under" 200'. Counsel said that he objected to the distance shown because it was allegedly from property line to property line but that it was admitted after the State showed the distance was from structure to structure. He denied he could have developed a defense that the transaction was not within 1000' of a school zone and could only attempt to exclude entirely the testimony concerning distance because it was "obviously" within 1000'. Counsel sent an investigator to the scene to ensure no issue existed with the distance. The Petitioner testified that he and counsel discussed the drug-free zone issue, how to challenge it, and what it would mean if he were convicted. The trial court found that counsel did all he could as to the transaction location being within a drug-free school zone. Nothing in the record preponderates against the court's findings.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-12-