IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2015 Session


**GDONGALAY P. BERRY v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 96-B-866     J. Randall Wyatt, Jr., Judge**

_____


**No. M2015-00052-CCA-R3-ECN – Filed March 23, 2016**

_____


Gdongalay P. Berry ("the Petitioner") was convicted of two of counts of first-degree premeditated murder, two counts of first-degree felony murder, two of counts especially aggravated kidnapping, and two of counts especially aggravated robbery in connection with the deaths of D'angelo McKinley Lee and Gregory Lanier Ewing.[1]  In this coram nobis proceeding, the Petitioner claims that a previously undisclosed videotaped interview of Yakou Murphy might have led to a different result had that interview been disclosed prior to trial.  After a hearing, the coram nobis court denied relief.  Discerning no error, we affirm the judgment of the coram nobis court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Patrick T. McNally, Nashville, Tennessee, and James E. Brenner, *pro hac vice*, Detroit, Michigan, for the appellant, Gdongalay P. Berry.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Glenn Funk, District Attorney General; and Dan Hamm and Katrin Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] The victims' names have been spelled various ways in prior opinions related to this case. However, we will spell the victims' names as they appear in the indictment.

## OPINION

## Factual and Procedural Background[2]

A jury convicted the Petitioner of two counts of first-degree premeditated murder, two counts of first-degree felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. Following a sentencing hearing, the jury found that three aggravating circumstances applied in each murder and that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Consequently, the jury sentenced the Petitioner to death for each of the murder convictions. After the sentencing hearing, the trial court merged each of the first-degree felony murder convictions into the convictions for first-degree premeditated murder for each respective victim, leaving the Petitioner with two first-degree murder convictions. As to the remaining convictions, the trial court sentenced the Petitioner as a violent offender and imposed an effective fifty-year sentence, to run consecutively to the Petitioner's death sentence, for a total effective sentence of death plus fifty years. The Petitioner's co-defendant, Christopher Davis, was tried separately, convicted for the same offenses, and also sentenced to death.

The jury found that one of the applicable aggravating factors was that the Petitioner and Mr. Davis were "previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." See Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1996). To find this aggravating factor, the jury relied on the fact that the Petitioner and Mr. Davis were convicted of murdering twelve-year-old Adrian Dickerson in Nashville. However, during the pendency of Mr. Davis's post-conviction proceedings, Mr. Davis's post-conviction counsel learned that one of the State's primary witnesses for the Dickerson murder, Calvin Carter, was actually incarcerated at the time of the Dickerson murder and could not have witnessed the shooting as he had claimed at trial. Consequently, the post-conviction courts for both the Petitioner and Mr. Davis found that it was error for the State to have relied on that conviction to secure death sentences and that such error was not harmless. Accordingly, both the Petitioner and Mr. Davis's death sentences were reversed, and they were granted new sentencing hearings. This court affirmed those rulings on appeal. Christopher A. Davis v. State, No. M2010-01045-CCA-R3-PD, 2012 WL 3679571, at *43-46 (Tenn. Crim. App. Aug. 24, 2012), perm. app. denied (Tenn. Dec. 12, 2012); Berry v. State, 366 S.W.3d 160, 183-85 (Tenn. Crim. App. 2011), perm.

---

[2] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal and the direct appeal of his co-defendant, Christopher Davis. See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

app. denied (Tenn. Feb. 16, 2012). In its order denying the Petition for Writ of Error Coram Nobis, the coram nobis court noted that the Petitioner's sentencing hearing had been continued pending the outcome of this coram nobis proceeding.

*The Petitioner's Trial*

In its opinion from the Petitioner's direct appeal, the Tennessee Supreme Court summarized the facts presented during the guilt phase of the trial as follows:

> . . . The State's proof showed that the [Petitioner] and a separately tried co-defendant, Christopher Davis, arranged to purchase weapons for $1200 from Lee and Ewing on the evening of February 27, 1996. Earlier that evening, the [Petitioner] and Davis were at Davis's apartment drinking and smoking marijuana with Ronald Benedict, Antoine Kirby, and Antonio Cartwright. Cartwright testified at trial that he overheard Davis and the [Petitioner] talking about robbing the two victims and taking their guns and automobile. Cartwright testified that the [Petitioner] stated, "If we rob 'em, we gotta kill 'em . . . [b]ecause they know us." Between 7:30 and 8:00 p.m. that evening, after receiving a telephone call from Lee, the [Petitioner], Davis, and two other men identified as "Kay" and "Sneak" left the apartment. Both the [Petitioner] and Davis were armed with guns—Davis with a 9mm handgun, the [Petitioner] with a .45 caliber handgun. Davis also carried a black bag containing handcuffs, rope, and duct tape. Approximately thirty minutes later, Kay and Sneak returned to the apartment. Thirty to forty-five minutes after that, the [Petitioner] and Davis also returned. They were driving Lee's Cadillac and were carrying at least six assault weapons, some pagers, and clothing, including Lee's distinctive green and yellow tennis shoes, and Ewing's jacket. Davis was wearing a gold cross necklace that belonged to Lee. The [Petitioner] told Cartwright that "Chris [Davis] couldn't kill Greg [Ewing], so I had to," and announced that he had shot Ewing multiple times in the head. After placing the assault weapons under Davis's bed, the [Petitioner] and Davis left the apartment in Lee's Cadillac and another vehicle. They drove to a sparsely wooded residential area off a dead-end street, set fire to the interior of the Cadillac, and abandoned it. The men then went to a Nashville motel where they spent the night.

> The next morning, Ewing's and Lee's bodies were found lying on a hill at a construction site in south Nashville near Interstate 440. Both victims were only partially clothed. A rope on the ground led up the hill to the body of one of the victims. Ewing had been shot three times in the head, twice in the shoulder, once in the neck, and once in the abdomen.

Lee had been shot three times in the head and once in the hand. Ballistics testing showed that the weapons used to kill the victims were 9mm and .45 caliber handguns.

By coincidence, at approximately 9:00 a.m. on the same morning the victims' bodies were found, three detectives from the Metropolitan Police Department went to Davis's apartment to investigate an unrelated crime. While questioning two men present at the apartment, Ronald Benedict and Antonio Cartwright, the detectives noticed the automatic rifles under the bed in Davis's bedroom. At about this time, the [Petitioner], Davis, Dimitrice Martin (Davis's girlfriend), and Brad Benedict (Ronald Benedict's brother), unexpectedly rushed through the front door. Davis was talking on a cell phone and had a .45 caliber handgun in his waistband. The [Petitioner] was carrying a fully loaded automatic rifle. Startled to see police present, the [Petitioner], Davis, and Brad Benedict turned and fled out the front door. The detectives pursued them and caught Davis. Benedict and the [Petitioner] escaped, although the [Petitioner] dropped the rifle he had been carrying. This rifle turned out to be one of the weapons stolen from Lee and Ewing.

A subsequent search of Davis's apartment yielded a 9mm pistol underneath the cushion of the couch where Ronald Benedict had been sitting. Forensic testing later revealed that the 9mm caliber bullets recovered from the victims' bodies were fired from this gun. The .45 caliber gun used in the crime was never found. Among the items police found in Davis's bedroom were a pair of handcuffs with a key, a pager, a cell phone, a Crown Royal bag containing $1400 in cash, a black backpack, a large quantity of ammunition, Lee's green and yellow tennis shoes, Ewing's jacket, two .45 caliber pistols, two SKS rifles, and one Universal .30 caliber M−1 carbine. At the time of the search, however, officers were unaware that the items were connected to the murders of Ewing and Lee.

Davis and his girlfriend, Dimitrice Martin, were taken to the police station for questioning. Before his interview, Davis removed Lee's gold cross necklace and told Martin to put it in her purse. He also instructed Martin to call Ronald Benedict's girlfriend at the apartment and tell her to dispose of Lee's green and yellow tennis shoes.

As a result of the questioning of Davis and Martin, police discovered the connection between Davis, the [Petitioner], and the murders of Lee and Ewing. The police took Lee's necklace from Martin. One of the detectives returned to Davis's apartment to retrieve Lee's tennis shoes and Ewing's

jacket. While he found Ewing's jacket on Davis's bed, the tennis shoes were gone.

After the [Petitioner] was eventually arrested on March 6, 1996, he waived his <u>Miranda</u> rights and gave a statement to police in which he admitted that he had been with Davis when the victims were robbed and killed. He disavowed any active role in the crimes and claimed that he had not known Davis intended to kill the victims. According to the [Petitioner], Davis and a third man, Christopher Loyal, had abducted Ewing and Lee after Ewing attempted to rob Davis. The [Petitioner] claimed that the victims were already handcuffed and restrained when he joined Davis and Loyal in the Cadillac. The group then drove to the construction site. Davis made the victims remove their clothing, and the [Petitioner] claimed he thought it would stop at that. As he watched, however, Davis and Loyal repeatedly shot the two men.

<u>State v. Berry</u>, 141 S.W.3d 549, 554-56 (Tenn. 2004) (footnotes omitted).

### a. Mr. Loyal's Testimony

Christopher Loyal testified at the Petitioner's trial that he arrived at Mr. Davis's apartment around 9:45 or 10:00 on the night of the murders. At the time, Yakou Murphy, "[a] guy they called 'Little Yo,'" "another female," and Mr. Davis's girlfriend, Dee Martin, were present at the apartment. Approximately thirty minutes after Mr. Loyal's arrival, Mr. Davis and the Petitioner arrived at the apartment in a white Cadillac. Mr. Davis asked Mr. Loyal to help them move bags and guns out of the car. Mr. Davis, Mr. Loyal, and the Petitioner brought pistols and rifles from the car into the apartment. Neither Mr. Davis nor the Petitioner told Mr. Loyal where they had acquired the guns. After they deposited the guns in the apartment, they "talked for a little" and then Mr. Loyal, Mr. Davis, Mr. Murphy, and the Petitioner left in the white Cadillac. During the drive, Mr. Davis said they were supposed to have bought the guns from someone, but they took the guns instead. Mr. Loyal recalled that the Petitioner made a comment about taking the guns, but Mr. Loyal could not remember the Petitioner's exact words. Mr. Loyal could not remember if the Petitioner said anything about shooting someone.[3]

---

[3] Mr. Loyal admitted in his testimony that he was a suspect in the victims' murders. However, our supreme court noted that Mr. Loyal was eliminated as a suspect during the investigation. <u>Berry</u>, 141 S.W.3d at 556 n.8.

### b. Ms. Martin's Testimony

Dimitrice "Dee" Martin testified that, on the night of the murder, she had been "in and out" of the apartment, shopping. Mr. Davis, Mr. Cartwright, the Petitioner, and others were in the living room listening to music. Ms. Martin did not hear any conversation from the other people in her home. At some point in the evening, Ms. Martin returned to the apartment and noticed that there were fewer people there than when she left. Ms. Davis left the apartment again sometime after 8:00 p.m. and returned around 9:00 or 10:00 p.m. At some point after Ms. Martin returned, the Petitioner and Mr. Davis came into the apartment carrying guns, a duffle bag, green tennis shoes, a necklace with a gold cross that had rubies and diamonds on it, and a coat that Ms. Martin had never seen before. Mr. Davis and the Petitioner took the guns into the bedroom that Ms. Martin shared with Mr. Davis and put the guns under the bed. The Petitioner did not say anything when they came back to the house, and Ms. Martin did not ask them anything. Ms. Martin stated that she had seen the Petitioner carrying a nine-millimeter pistol earlier in the evening.

### c. Mr. Cartwright's Testimony

On cross-examination, Mr. Cartwright admitted that he gave a statement to police the day after the murder. Defense counsel read a portion of the transcript of Mr. Cartwright's statement into the record, which included the following exchange:

> [Detective]: Okay. When they came back in—in, what time was it, roughly?
>
> [Mr. Cartwright]: I really can't say. About 9:30, 10 o'clock.
>
> [Detective]: And what did they say?
>
> [Mr. Cartwright]: They said, man.
>
> [Detective]: Who, specifically, said what?
>
> [Mr. Cartwright]: [The Petitioner] didn't say nothing. He wasn't even like talking. Chris [Davis] said, "Man," said, "Man, I did it."

After hearing this exchange, Mr. Cartwright stated that it "kind of" refreshed his memory, but he noted that he was fourteen at the time he gave his statement and that he "can't recall everything." However, Mr. Cartwright acknowledged that this statement was given less than thirty-two hours after the murders and that his memory of the event was better at that time than it was at trial. Nevertheless, Mr. Cartwright insisted that, at some point during his statement, he told the detective that the Petitioner "said something." On

redirect-examination, Mr. Cartwright read a portion of his statement wherein he said, "He said, he shot Greg.  He said, Chris shot D.B."  However, on re-cross examination, the following exchange occurred:

> [Defense counsel]:  [Reading a question from the detective] "Have you heard him talk about doing other stuff?"  [Mr. Cartwright's] response is, "No.  Chris done told me."  You meant Chris Davis, correct?
>
> [Mr. Cartwright]:  Correct.
>
> [Defense counsel]:  Okay.  "He said, 'Man'—he said, 'Man, uh,'—he said, 'Man, uh'—he said, 'Man, I really don't like giving him the gun.  'Cause like last night,' uh—he said, he gave [the Petitioner] the gun.  He said, 'Man, he just started popping.'  He said, 'He shot Greg.'  He said, 'Chris shot D.B.'"

Mr. Cartwright admitted that that statement was prefaced with the comment "Chris done told me," but Mr. Cartwright could not confirm that he was talking about comments made by Mr. Davis because he was nervous during his police interview.  However, Mr. Cartwright reasoned that the Petitioner was the only person he could have been referring to when he said, "He said, 'He shot Greg.' He said, 'Chris shot D.B.'"[4]

### Mr. Cartwright's Testimony at Christopher Davis's Trial

Two months after he testified in the Petitioner's trial, Mr. Cartwright testified in the trial of Christopher Davis.  At that trial, Mr. Cartwright testified that Mr. Davis, not the Petitioner, was the person who said that they would have to kill Mr. Lee and Mr. Ewing "[b]ecause they knew who they was [sic] and they knew where they stay."  According to Mr. Cartwright, when Mr. Davis and the Petitioner returned with the Cadillac and guns, Mr. Davis said that he had cocked his gun, fired a shot, and "drew down on [Mr. Lee]."  Mr. Davis then took Mr. Lee's gun and forced Mr. Lee into the trunk of the car.  According to Mr. Cartwright, Mr. Davis also said that he had shot Mr. Lee in the head nine times and that "they dumped their body [sic] where someone wouldn't find 'em."  The Petitioner then said that they had to burn the Cadillac.  Mr. Davis's counsel did not address the discrepancy between Mr. Cartwright's testimony in the Petitioner's and Mr. Davis's respective trials.

---

[4] During his testimony at Mr. Davis's trial, Mr. Cartwright explained that "D.B." was a nickname for Mr. Lee.

*Newly Discovered Evidence*

On November 2, 2012, the Petitioner filed a Petition for Writ of Error Coram Nobis ("the Petition") presenting as newly discovered evidence a video-taped police interview of Yakou Murphy, which the Petitioner discovered after this court issued its opinion in the Petitioner's appeal from his post-conviction proceedings. See generally Berry, 366 S.W.3d 160. The Petitioner claimed that the "videotape [was] evidence that may have resulted in a different judgment, had it been presented at trial" and that the State violated Brady v. Maryland, 373 U.S. 83 (1963) when it failed to disclose the existence of the tape prior to the Petitioner's trial.

On March 14, 1996, Mr. Murphy was interviewed by Detectives Mike Roland and Shellie Kendall in connection with the victims' murders and other, unrelated offenses. During that interview, Detective Roland informed Mr. Murphy that the Petitioner and Mr. Davis had been arrested for the murders of Mr. Lee and Mr. Ewing. Detective Roland also told Mr. Murphy that either the Petitioner or Mr. Davis had told Detective Roland that Mr. Murphy was present when Mr. Lee and Mr. Ewing were killed.[5] Mr. Murphy denied knowing anything about the murders or being present when the victims were killed.

Mr. Murphy said he went to Mr. Davis's apartment around 2:00 or 3:00 p.m. on the day in question, but he could not recall who was at the apartment when he arrived. However, Mr. Murphy stated that Mr. Davis, the Petitioner, and "Sneak" came to the apartment and were "talking about trading or something or buying or something." Mr. Murphy thought they were preparing "to buy some guns or sell them or somethin'." At another point in the interview, Mr. Murphy said, "I know they supposed to made a trade or something for some guns[.]" At some point in the evening, Mr. Murphy left the apartment with the Petitioner, Mr. Davis, and Sneak, but they later returned to the apartment. Later in the evening, "everybody who was up in that house" left, leaving Mr. Murphy and Sneak in the apartment with a "dude and gal . . . that live there."

Mr. Murphy was also at the apartment when the Petitioner, Mr. Davis, and others brought the guns back to the apartment and "laid them on the bed." Mr. Murphy also recalled that the Petitioner and Mr. Davis arrived in a grey or beige Cadillac, which Mr. Murphy thought was stolen. Mr. Murphy said he did not know everyone who walked in with the guns because he had begun socializing with Mr. Davis's group only recently.

Mr. Murphy maintained that he did not hear anyone say anything about killing another person when the Petitioner and Mr. Davis returned with the guns. Mr. Murphy

---

[5] Detective Roland refused to tell Mr. Murphy which person had implicated Mr. Murphy in the victims' murder.

explained that he was sitting on the couch when Mr. Davis and the Petitioner returned. Everyone else in the apartment followed the Petitioner and Mr. Davis into the bedroom with the guns. Curious, Mr. Murphy left the couch and joined everyone else in the bedroom to "see what was up[.]" Mr. Murphy insisted that he was the last person to leave the couch and go into the bedroom.

When he entered the bedroom, Mr. Murphy saw the guns laid out on the bed and everyone "was looking at them and then they was like [']we fixin' to get ready to go['] and everybody left" and spent the night in another location. Mr. Murphy insisted that the people in the room "weren't talking about nothing. They didn't say nothing." Detective Roland pushed Mr. Murphy to recall conversations he overheard, resulting in the following exchanges:

> Detective Roland: Come on now. Now there was somebody. There was, I've already talked to some of them people there and when everybody was standing around and looking at the guns and stuff they was talking. You heard what they was [sic] talking about.

> Mr. Murphy: They didn't tell me. That's what I'm saying.

> * * *

> Detective Roland: You heard stuff. You saw stuff or you were there when they killed them. It was one or the other. It has got to be one way or the other.

> Mr. Murphy: Man, the only thing . . .

> Detective Roland: And if I go by what they say then I'm going to have to arrest you for criminal homicide.

> Mr. Murphy: You ain't got to go by what they say when I, when I told you, I said.

> Detective Roland: You ain't told me nothing yet.

> Mr. Murphy: I told you I didn't see nothing, but I heard . . .

> Detective Roland: I'm asking you some specific questions. They are not going to bring in a bunch of guns and lay them down on the bed and everybody just stand there and look at it and then leave.

Mr. Murphy:  I told you what I heard though.  I told I heard that they were supposed to have been making a trade or a money deal or something.

Detective Roland:  That was before.  Now they have come back in with the guns.

Mr. Murphy:  And I didn't hear nothing, man.

Detective Roland:  And then you, you, do you think I'm stupid?

Mr. Murphy:  No.  Man, I know you ain't stupid.

Detective Roland:  You are going to say there is a whole bunch of people standing around this bed and they lay these guns out and everybody looks at them and that is the end of that?

Mr. Murphy:  Man, I promise.  I promise, man, they said they had to make a gun trade or a gun deal, man, that's all.

Detective Roland:  And that was before and you told me that.

Mr. Murphy:  And that is what I heard.

Detective Roland:  And now they left and you sat there at that apartment the whole time and then they come back—

Mr. Murphy:  With some guns.

Detective Roland: —and they come back with some guns and they walk in and lay them on the bed and everybody looks at them and then they leave and that is it, didn't nobody say a word about the guns, where they came from, who they killed or whatever?

Mr. Murphy:  They didn't say nothing like that.  I just know they bought some guns.  They supposed to have went and bought some guns and I thought they bought some guns.

* * *

Detective Roland:  I'll tell you what I'm going to do, I'm going to leave it like you said that y'all looked at guns and that was it and nothing was said.

Mr. Murphy:  That's what happened though.

Detective Roland: But that is not going to help you. That is not going to help you at all.

Mr. Murphy: Man, I'm, I'm telling you everything I know, man, I swear.

Detective Roland: Well, I find it, I find it hard to believe that nobody said nothing when they laid them guns on the bed, that nobody said nothing. I can't believe that. I will never believe that nobody didn't say anything.

Mr. Murphy: They didn't tell me about killing, man.

Detective Roland: I am not going to say that they sat down and said [']hey, K, this is what happened, we drove them off, we did this, and we did that,['] but when all of them people were standing around that bed looking at these guns, somebody in that room was bragging, I know who it is and, I know what he said—

Mr. Murphy: They, they might have been bragging in that room.

* * *

Detective Roland: I'm tired of asking, but I will never in my life believe, and I don't think any Judge or jury is ever going to believe, that you stood there and looked at those guns and didn't hear anybody say nothing.

Mr. Murphy: All right. It was just, they was like looking at the guns and then, you know, it was like [']I want this one,['] uh-huh, like that, and then it was, [']naw, don't touch anything,['] like that. It was just stuff like that happening, but other than that they wasn't talking about nothing.

Detective Roland told Mr. Murphy that there was a possibility Mr. Murphy could be charged with the murder of Mr. Lee and Mr. Ewing. However, Mr. Murphy insisted that he did not have anything to do with the murders and did not know anything about them. The detectives also asked Mr. Murphy to look at several photographic lineups and identify anyone he saw in Mr. Davis's apartment on the night in question. Mr. Murphy was able to identify two photographs that he thought were of Mr. Davis and the Petitioner. However, one of those photographic lineups included Mr. Murphy's own photograph, but he was not able to identify himself until the detectives pointed it out.

*Hearing on the Petition*

At the hearing on the Petition, Matthew Sweeney testified that he represented Mr. Davis during his post-conviction proceedings. During those proceedings, Mr. Sweeney

- 11 -

spoke with Mr. Davis's original attorneys, obtained their files for Mr. Davis's case, and was granted access to the State's file. As he was going through the files, Mr. Sweeney tried to find statements from the people Mr. Cartwright identified as being present at Mr. Davis's apartment on the night of the murder, but he could not find the statements in the files. Mr. Sweeney agreed that Mr. Cartwright's testimony was "very important" to the State's case against Mr. Davis and the Petitioner. Mr. Sweeney noted that Mr. Cartwright was the only witness that testified as to statements which were allegedly made about plans to rob and kill the victims. As such, Mr. Sweeney felt it necessary to compare Mr. Cartwright's testimony to the statements from other witnesses.

Mr. Sweeney recalled there was no recorded statement or transcript of a statement from Mr. Murphy in any of the files. Mr. Sweeney asked the prosecutor for Mr. Murphy's statement, and the prosecutor informed Mr. Sweeney that he thought Mr. Murphy had given a statement but that he was still trying to find it. Later, the prosecutor informed Mr. Sweeney that he had found a videotape of Mr. Murphy's interview with the police. The videotaped interview was turned over to Mr. Sweeney nine years after Mr. Davis's trial.

Mr. Sweeney reviewed Mr. Murphy's statement and thought that it was "very relevant" to the underlying case against Mr. Davis because Mr. Murphy denied hearing any statements about the victims being killed, contradicting Mr. Cartwright's testimony. Additionally, Mr. Murphy's statement was contradictory to the testimony he gave in Mr. Davis's trial. In February 2012, in response to a request from the Petitioner's post-conviction counsel, Mr. Sweeney gave the Petitioner's counsel a copy of Mr. Murphy's videotaped interview.

During cross-examination, Mr. Sweeney acknowledged that he argued during Mr. Davis's post-conviction proceedings that the State violated Brady by failing to turn over a copy of Mr. Murphy's interview. However, the post-conviction court and this court concluded that Mr. Murphy's interview was not material as defined by Brady.

James Brenner testified that he represented the Petitioner during post-conviction proceedings. While preparing for the Petitioner's post-conviction hearing, Mr. Brenner reviewed the Petitioner's trial counsel's file. However, Mr. Brenner did not find Mr. Murphy's videotaped statement in the file. Mr. Brenner first learned about Mr. Murphy's statement after this court had affirmed the partial denial of post-conviction relief. While he was preparing the Petitioner's application to appeal to the Tennessee Supreme Court in November 2011, Mr. Brenner read the brief Mr. Davis submitted to this court in his post-conviction proceedings and discovered that Mr. Murphy had given a videotaped statement. Mr. Brenner obtained a copy of Mr. Murphy's statement and decided to file a Petition for Writ of Error Coram Nobis.

At the coram nobis hearing, Detective Roland testified that he interviewed Mr. Murphy in March 1996. Although Detective Roland recalled that he testified at the Petitioner's trial, he was unaware of why he was not asked about Mr. Murphy's interview at that time.

Hershell Koger testified that he represented Mr. Davis at trial. He recalled that the Petitioner was tried before Mr. Davis. Prior to trial, Mr. Koger had not seen Mr. Murphy's videotaped interview or a transcript thereof. Mr. Koger recalled that Mr. Cartwright testified at trial that he heard Mr. Davis say, "[I]f we rob'em, we have to kill 'em, because they know us[.]" But Mr. Koger also recalled that Mr. Cartwright had attributed that same comment to the Petitioner during the Petitioner's trial. Mr. Koger agreed that Mr. Cartwright was a "very material witness" for the State's case and that his testimony helped prove premeditation. Mr. Koger also recalled that he had called Mr. Murphy as a witness for Mr. Davis's defense. Mr. Koger stated that what Mr. Murphy said in his videotaped interview provided "a lot of other information" that was inconsistent with Mr. Cartwright's testimony. Mr. Koger stated that he would have, at a minimum, used Mr. Murphy's videotaped statement to impeach Mr. Cartwright's testimony and also used the information to question Mr. Murphy about the night in question. Mr. Koger acknowledged that Mr. Murphy's statement could have had different impacts in Mr. Davis's and the Petitioner's respective trials.

On cross-examination, Mr. Koger agreed that Mr. Murphy was not being completely honest with detectives during his taped interview. Additionally, Mr. Koger noted that there were "some credibility issues with Mr. Murphy's statement" and "when you listen to the entire thing it is amazing how much non-information [Mr.] Murphy provided through the whole thing." In short, Mr. Koger stated that, even if Mr. Murphy's statement had been introduced at trial, there was enough "unbelievability" in his statement that the jury could disbelieve Mr. Murphy's account of the evening. However, Mr. Koger thought he could have asked Mr. Murphy during direct examination whether he heard anyone talking about killing someone. Mr. Koger acknowledged that he did not know what Mr. Murphy would have said in response to such a question, but if Mr. Murphy's answer contradicted Mr. Cartwright's testimony, Mr. Koger could have argued the discrepancy to the jury. Additionally, Mr. Koger admitted that Mr. Murphy's testimony that both Mr. Davis and the Petitioner brought the guns into the apartment did not help either Mr. Davis or the Petitioner. When asked if Mr. Murphy's videotaped statement would have changed the outcome of Mr. Davis's trial, Mr. Koger stated:

I am going to give a qualified no, because I—because I, you know, sitting here how many ever years later, [fifteen] years later, it is really hard to throw it into the mix of what we would or not, would have not done with it, but putting all of that aside and being objective, there was a lot of evidence,

- 13 -

you know, there was a lot of evidence without Mr. Cartwright's testimony that would have still made it a tough case for us at trial and, uh, it may have had an impact, but if you put a gun to my head and said what do you really think, I'd say no.

On redirect-examination, Mr. Koger noted that Mr. Davis was seen wearing a necklace that belonged to one of the victims. He also stated that he did not have detailed knowledge of the evidence against the Petitioner.

Michie Gibson testified that he represented the Petitioner during the Petitioner's trial. As part of the preparation for trial, Mr. Gibson filed a request for disclosure of impeachment and exculpatory evidence as well as a standard discovery request, which included a request for Brady material. The State provided the following response to Mr. Gibson's request:

> In accordance with the decision in Brady v. Maryland, 373 U.S. 83 (1963), all items of exculpatory nature, if any there be, will be furnished to defense counsel if and when any such item or information becomes known to the State. **None at this time.**
>
> Defense counsel may assume that any specific request which is not answered is either not discoverable or the information requested in not available. The State cannot provide evidence material to the defense or exculpatory to the defendant until such is made known to the State.

(Emphasis in original). Mr. Gibson stated that he was not given Mr. Murphy's videotaped statement prior to trial.

Mr. Gibson recalled that Mr. Cartwright was an important witness for the State during the Petitioner's trial and that Mr. Cartwright identified the Petitioner as saying "If we rob 'em, we have to kill 'em, because they know us[.]" At trial, Mr. Gibson did not have anything to rebut Mr. Cartwright's testimony. Mr. Gibson stated that, if he had Mr. Murphy's recorded interview, he would have investigated Mr. Murphy prior to trial to see if he would testify consistently with the statement he gave to police. If so, Mr. Gibson would have called Mr. Murphy as a witness and "married him to his statement to the police." Additionally, Mr. Gibson said that he would have cross-examined Mr. Cartwright to highlight the fact that there was another person in the apartment at the same time who did not hear what Mr. Cartwright alleged the Petitioner said. Further, he would have cross-examined Detective Roland about the inconsistencies between Mr. Cartwright's testimony and Mr. Murphy's statement. Mr. Gibson thought Mr. Murphy's statement may have made a difference at trial.

- 14 -

Donald Dawson testified that he practiced law with the public defender's office in Louisville, Kentucky for four years, with the federal public defender's office in Nashville for six years, in private practice for eight years, and with the Tennessee post-conviction public defender for sixteen years before he retired. At the post-conviction public defender's office, Mr. Dawson exclusively represented capital defendants during their post-conviction proceedings. In preparation for his testimony, Mr. Dawson read the transcript of the Petitioner's trial and reviewed the video and the accompanying transcript of Mr. Murphy's videotaped interview several times.

Mr. Dawson noted that Mr. Murphy was present both before and after the killing and robbery and, other than Mr. Cartwright, Mr. Murphy was the only person who could have testified about both of those time frames. Mr. Dawson thought it was "significant" that Mr. Murphy insisted that he did not hear anyone talk about killing another person, even though he was with the Petitioner and Mr. Davis for periods of time both before and after the offense, sometimes in a smaller group setting where Mr. Dawson would expect "they might say something." Mr. Dawson thought the videotape would have been useful for the Petitioner at his trial. He agreed that Mr. Murphy's statement could have been used to cross-examine Detective Roland because counsel could have asked Detective Roland whether there were other witnesses who said they did not hear anything. Additionally, Mr. Dawson noted that Mr. Murphy's statement was inconsistent with Mr. Cartwright's testimony in terms of "having heard somebody say anything about killing anybody" as well as "who was where when." Further, Mr. Dawson stated that Mr. Murphy's interview was consistent with the testimony of Mr. Loyal and Ms. Martin that they did not hear anyone say anything about killing someone; however, he noted that Mr. Loyal and Ms. Martin were not present the entire time. Instead, Mr. Murphy was the only one present for all the relevant time periods, so Mr. Dawson believed that Mr. Murphy's testimony "would be both inconsistent with [Mr.] Cartwright's and also more . . . inclusive of all of the time that would be relevant to Mr. Cartwright's testimony." In short, Mr. Dawson thought that Mr. Murphy's statement was "a very valuable piece of evidence" and that it could have opened up other avenues of investigation to prepare for trial. Specifically, Mr. Dawson stated,

> [T]here was evidence in the statements from [Mr.] Murphy that[,] read in conjunction with some of the other evidence that was presented, some of the other statements that could have indicated another person at the scene that basically would have been consistent with [the Petitioner's] statement, so it would have supported while attacking the statement of [Mr.] Cartwright it also would have given some additional support for [the Petitioner's] statement.

- 15 -

On cross-examination, Mr. Dawson acknowledged that the Petitioner, in his statement, did not deny being present when the murders happened. Instead, Mr. Dawson recalled that the Petitioner admitted to being involved in the robbery and that Mr. Lee or Mr. Ewing pulled a gun on Mr. Davis, but the Petitioner stated that he did not think anyone would be killed. However, Mr. Dawson asserted that there was a "colorable argument" that the jury would have not convicted the Petitioner of felony murder if the jury believed that he did not think anyone was going to be killed and that he had no ability to stop the killing.

Deputy District Attorney General Tom Thurman testified that he was responsible for answering the Petitioner's discovery requests prior to the Petitioner's trial. At the time, the district attorney general's office had an open-file discovery policy, and both of the Petitioner's attorneys came to the district attorney general's office to view the State's file and identify documents that they wanted to copy. General Thurman stated that the videotape of Mr. Murphy's interview was found in the file for another murder case because Mr. Murphy was involved in several different homicides.[6]

In a written order, the coram nobis court noted that Mr. Davis had raised the existence of Mr. Murphy's videotaped interview as a Brady claim during his post-conviction proceedings and that both the post-conviction court and this court found that the video was not material under a Brady analysis. See Christopher A. Davis, 2012 WL 3679571, at *25. The coram nobis court also found that the Petition was untimely filed; the Petitioner's motion for new trial was denied in 2001, and the Petition was not filed until November 2012, well outside the one-year statute of limitations. However, the coram nobis court found that due process required that the statute of limitations be tolled.

As to the merits of the Petitioner's claim, the coram nobis court acknowledged that Mr. Murphy's police interview could have been used to impeach Mr. Cartwright's testimony and that Mr. Murphy could have been called as a witness, that Mr. Murphy's prior statement could have been used to "identify inconsistencies in his potential testimony," and that Detective Roland could have been asked about his interview with Mr. Murphy and how Mr. Murphy's statement "compared to those offered by other involved persons." However, the coram nobis court found that the Petitioner had failed to establish that Mr. Murphy's recorded interview might have led to a different outcome at trial. The coram nobis court stated that Mr. Loyal was at Mr. Davis's apartment when the Petitioner and Mr. Davis returned with the guns and that he rode in the car with them some time after their arrival at the apartment. Mr. Loyal denied having any knowledge about a gun deal prior to the Petitioner's and Mr. Davis's arrival, and he stated that he could not remember whether the Petitioner had said anything about shooting someone.

---

[6] The record indicates that Mr. Murphy's statement was found in the file for State v. Donald Moore, another murder case that Mr. Murphy was asked about during his videotaped interview.

- 16 -

Additionally, Ms. Martin was in and out of Mr. Davis's apartment on the night of the offense, and she denied hearing any conversation and did not ask the Petitioner or Mr. Davis where they got the guns. Further, after the Petitioner and Mr. Davis brought the guns into the apartment, Ms. Martin left with them to go to a hotel. As such, the coram nobis court found that the portion of Mr. Murphy's interview in which he stated that he did not hear any post-offense comments about robbing or killing anyone would have been merely cumulative. Likewise, the coram nobis court found that Ms. Martin's testimony that she did not hear any conversation regarding the Petitioner's and Mr. Davis's intentions prior to leaving the apartment "necessarily meant Ms. Martin's testimony included a denial that she heard the co[-]defendants planning to rob or kill anyone." Such testimony was consistent with Mr. Murphy's statement that he did not hear any discussion of robbery or murder before the Petitioner and Mr. Davis left the apartment. Although Mr. Murphy was present the entire time, as opposed to Ms. Martin's going "in and out" of the apartment, the coram nobis court found that Mr. Murphy's "interview offered no more insight regarding pre-offense activities than Ms. Martin's testimony" and, therefore, was cumulative.

Additionally, the coram nobis court found that Mr. Cartwright was impeached through testimony regarding his membership in the Gangster Disciples and through his own pretrial statement to police, in which he said both that the Petitioner said nothing about the offenses and that the Petitioner admitted to killing Mr. Ewing. Moreover, the coram nobis court found that Mr. Murphy would have been impeached at trial and that his "evasive and uncooperative demeanor" in the video raised "significant credibility concerns[.]" Finally, although witnesses for the Petitioner said that, had trial counsel known about Mr. Murphy's interview, trial counsel could have used that information to pursue other strategies and interview other witnesses, the coram nobis court found that the Petitioner had not identified those potential witnesses, had not indicated what information they might have developed, or "how such information and resulting defense tactics might have led to a different outcome at trial."

As to the Petitioner's Brady claim, the coram nobis court found that the Petitioner had failed to prove that Mr. Murphy's interview was material as defined under Brady. As stated by the court, "Certainly, if the [P]etitioner cannot establish the Murphy video *may have* led to a different result, he cannot reach the higher evidentiary standard of establishing a *reasonable probability* of a different outcome." (Emphasis in original). Accordingly, the court found that the State's failure to provide the Petitioner with a copy of Mr. Murphy's interview did not deny the Petitioner a fair trial or undermine confidence in the jury's verdict. This timely appeal followed.

## Analysis

### *Error Coram Nobis Claim*

On appeal, neither party challenges the coram nobis court's finding that due process requires that the statute of limitations be tolled or that the evidence is newly discovered. As such, we will limit our analysis to whether the disclosure of Mr. Murphy's videotaped interview might have led to a different outcome at trial.

The Petitioner argues that the coram nobis court erred in denying relief because Mr. Cartwright's testimony was the only evidence presented that "implicated [the Petitioner] in the killing of anyone," making Mr. Cartwright an indispensible witness. the Petitioner contends that without Mr. Cartwright's testimony, the State would not have been able to prove premeditation, "the felony murder charge would have been jeopardized," and "a reasonable jury may have found [the Petitioner] at most guilty as a facilitator if guilty of anything." To support this claim, the Petitioner distinguishes the impact Mr. Cartwright's testimony had in his trial from the impact it had in Mr. Davis's trial by noting that the State relied on other evidence, apart from Mr. Cartwright's testimony, to implicate Mr. Davis in the murders, including Mr. Davis's own testimony. Additionally, the Petitioner contends that Mr. Murphy's interview was not merely cumulative to the testimony of Mr. Loyal and Ms. Martin because Mr. Murphy was present at the apartment during times when neither Mr. Loyal nor Ms. Martin was present. Further, the Petitioner contends that the State intentionally refrained from questioning Detective Roland about Mr. Murphy's interview in order to keep Mr. Murphy's statement from being introduced at trial because Mr. Murphy's statement would "tarnish [Mr.] Cartwright's credibility."

Regarding the coram nobis court's finding that Mr. Cartwright was impeached at trial, the Petitioner claims that any testimony that was intended to impeach Mr. Cartwright "misfired" because the jury "paid no apparent heed" to the impeaching evidence, thus rendering Mr. Murphy's videotaped interview "all the more necessary to the defense[.]" Moreover, the Petitioner claims that the jury was entitled to make a credibility determination about Mr. Murphy and they "never had the chance to weigh the credibility of [Mr.] Murphy because the State did not produce him as a witness or disclose his videotaped statement." As to the coram nobis court's finding that the Petitioner failed to identify potential witnesses or strategies that may have been developed from Mr. Murphy's statement, the Petitioner notes that witnesses at the coram nobis hearing stated that they could have used Mr. Murphy's statement to cross-examine witnesses at trial, called Mr. Murphy as a witness, argued the inconsistencies between Mr. Murphy's and Mr. Cartwright's accounts during closing argument, or asked for a missing witness instruction regarding the failure of the State to call Mr. Murphy.

The State argues that Mr. Murphy's statement was cumulative to the testimony of Mr. Loyal and Ms. Martin and, therefore, does not rise to the level warranting coram nobis relief. Additionally, the State contends that the coram nobis court did not abuse its discretion when it found that Mr. Cartwright was impeached at trial and that Mr. Murphy would have had credibility issues had his statement been played at trial. Further, the State asserts that Mr. Cartwright was not an indispensible witness to the State's case because multiple other witnesses testified about the Petitioner's behavior on the night of the murders, the Petitioner gave a statement to police in which he acknowledged he was present when the victims were killed, and the victims' clothing and vehicle ended up in the possession of the Petitioner and Mr. Davis.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. See Harris v. State, 102 S.W.3d 587, 592 (Tenn. 2003). "Coram nobis claims may be based upon any 'newly discovered evidence relating to matters litigated at the trial' so long as the petitioner establishes that he or she was 'without fault' in failing to present the evidence at the proper time." Id. at 592-93. Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. Id. at 593. The petitioner bears the burden of proving his coram nobis claims. See Wlodarz v. State, 361 S.W.3d 490, 499 (Tenn. 2012).

"[I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity. If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result." State v. Vasques, 221

S.W.3d 514, 527 (Tenn. 2007) (emphasis in original). In determining whether the new information may have led to a different result, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceedings might have been different." Id. (citing State v. Roberto Vasques et al, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. Oct. 7, 2005)). Generally, "newly discovered evidence which is merely cumulative or 'serves no other purpose than to contradict or impeach' does not warrant the issuance of a writ." Wlodarz, 361 S.W.3d at 499 (quoting State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995)). The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. Vasques, 221 S.W.3d at 527-28.

In this case, the coram nobis court correctly determined that Mr. Murphy's videotaped interview was merely cumulative to the evidence presented at trial. Both Mr. Loyal and Ms. Martin testified that they were present at the apartment on the night of the murders and did not hear anyone discussing killing the two victims. The Petitioner contends that Mr. Murphy was the only person present during the entire time Mr. Davis and the Petitioner were in the apartment. However, in his interview with police Mr. Murphy insisted that after the Petitioner and Mr. Davis returned to the apartment, Mr. Murphy was the last person to leave the couch and join the crowd of people in the bedroom. Further, Mr. Murphy insisted that he never heard anyone talk about killing the victims, necessarily implying that he did not hear discussion of the murders before the Petitioner and Mr. Davis left the apartment. Such evidence is cumulative to Ms. Martin's testimony that she did not hear any conversations between the people in the apartment before Mr. Davis and the Petitioner left. Additionally, Mr. Murphy maintained that he did not hear any discussion of murder after the Petitioner and Mr. Davis returned with the guns, which was consistent with both Ms. Martin's and Mr. Loyal's testimony at trial. As such, the trial court did not abuse its discretion when it found that Mr. Murphy's interview was merely cumulative to the evidence presented at trial.

The coram nobis court also found that Mr. Murphy would have been open to impeachment by his own videotaped statement had he testified at trial. This court has viewed the videotaped statement and read the accompanying transcript. Throughout the interview, Mr. Murphy gave evasive answers, demonstrated an uncooperative demeanor, and he was unable to identify himself in a photographic lineup. Additionally, it is clear from the video that Mr. Murphy was attempting to distance himself from any involvement in the murder of Mr. Lee and Mr. Ewing after Detective Roland informed him that he had been implicated in the murders. As such, the coram nobis court did not abuse its discretion when it found that introduction of Mr. Murphy's recorded interview could have caused "significant credibility concerns" if Mr. Murphy testified.

Moreover, the coram nobis court did not abuse its discretion when it found that Mr. Cartwright had been impeached at trial. Mr. Cartwright admitted that he was a member of the Gangster Disciples and that he was smoking marijuana and drinking alcohol the night of the murders. Additionally, the Petitioner's counsel read part of Mr. Cartwright's statement to police into the record wherein Mr. Cartwright told police that the Petitioner "didn't say nothing. He wasn't even like talking. Chris said, 'Man,' said, 'Man, I did it.'" Additionally, Mr. Cartwright's testimony was contradicted by the testimony of both Mr. Loyal and Ms. Martin in which they said they did not hear the Petitioner discussing the murders. The coram nobis court did not abuse its discretion when it found that Mr. Cartwright's testimony was impeached without the introduction of Mr. Murphy's statement.

The Petitioner notes that the jury seemed to disregard this impeaching evidence, but we do not believe the introduction of Mr. Murphy's statement would have further impeached Mr. Cartwright's testimony to the point that the outcome of trial might have been different. Mr. Cartwright was not as "indispensible" of a witness as the Petitioner claims. True, Mr. Cartwright's testimony that the Petitioner said, "If we rob 'em, we gotta kill 'em . . . [b]ecause they know us," was important to establish premeditation. However, that was not the only evidence the State introduced to prove premeditation. During the Petitioner's direct appeal, our supreme court concluded that the evidence was sufficient for the jury to find that the Petitioner "acted with the culpability necessary to hold him criminally responsible for the kidnapping, robbery, and murder of the victims." Berry, 141 S.W.3d at 566. Taking Mr. Cartwright's testimony out of consideration, the Petitioner was still seen leaving the apartment with handcuffs, rope, and duct tape to meet the victims in order to steal their guns. Id. The victims were found in a remote location, partially undressed, and a rope left at the scene indicated the victims had been bound. Id. Both victims were shot multiple times with a nine-millimeter and a .45 caliber handgun, the same caliber weapons Mr. Davis and the Petitioner were carrying when they left the apartment. See id. at 554-55, 566. Finally, the Petitioner returned to the apartment in Mr. Lee's car with multiple assault weapons, deposited the weapons at Mr. Davis's apartment, and then left to burn Mr. Lee's car and spend the night at a hotel. Id. at 566. The Petitioner returned the next morning to find police in Mr. Davis's apartment and then fled the scene. Id. at 566-67.

Furthermore, the Petitioner was charged and convicted of first-degree felony murder, and, as our supreme court noted, the evidence showed that both of the victims were found shot to death. Additionally, Mr. Murphy stated in his interview that the Petitioner and Mr. Davis were openly discussing a gun deal, and the proof at trial showed that they were later seen in possession of the victims' car, jewelry, clothing, and weapons. Id. at 567. The Petitioner gave a statement to the police in which he admitted that he was present at the scene of the murders but denied knowing that Mr. Davis

planned to kill the victims. However, a defendant may be convicted of felony murder even when the killing was unintended. See State v. Kimbrough, 924 S.W.2d 888, 890 (Tenn. 1996) (stating "[f]elony murder differs from other forms of murder because it holds the actor strictly accountable even where the killing is unintended"). The Petitioner also claimed that Mr. Loyal and Mr. Davis were the ones who actually killed the victims, but Mr. Loyal's testimony established that he arrived at the apartment approximately thirty minutes before the Petitioner and Mr. Davis returned with the victims' guns and that neither the Petitioner nor Mr. Davis told Mr. Loyal where they acquired the guns.

Additionally, we note that the Petitioner contends that he could have used Mr. Murphy's statement to cross-examine witnesses at trial, call Mr. Murphy as a witness, argued the inconsistencies between Mr. Murphy's and Mr. Cartwright's accounts during closing argument, or asked for a missing witness instruction regarding the failure of the State to call Mr. Murphy. However, as established above, Mr. Cartwright's testimony was not the only incriminating evidence against the Petitioner. Accordingly, we do not believe that the Petitioner has proven that the outcome of trial might have been different even if he was able to use Mr. Murphy's statement in the manner he describes. As such, the coram nobis court did not abuse its discretion when it found that the Petitioner had failed to establish that Mr. Murphy's statement might have led to a different result at trial.

The Petitioner also claims that the State intentionally refrained from questioning Detective Roland about Mr. Murphy's interview in order to keep Mr. Murphy's statement from being introduced at trial because Mr. Murphy's statement would "tarnish [Mr.] Cartwright's credibility." However, no proof was presented at the coram nobis hearing that the State intentionally refrained from pursuing this line of questioning, and the coram nobis court did not address this claim in its order denying relief. Issues raised for the first time on appeal are deemed waived. Tenn. R. App. P. 36(a); see also State v. Johnson, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996). As such the Petitioner is not entitled to relief on this claim.

### *Brady* Claim

The Petitioner also asserts that the State's failure to turn over Mr. Murphy's videotaped interview prior to trial constitutes a Brady violation. The United States' Supreme Court stated in Brady v. Maryland that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Even if the defendant does not specifically request evidence, favorable evidence is material, and its suppression is a constitutional violation, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would have* been different." United States v. Bagley, 473 U.S. 667, 682 (1985) (emphasis added). "Reasonable probability" is defined as "a

probability sufficient to undermine the confidence in the outcome." Id. The defendant bears the burden of proving a constitutional violation by a preponderance of the evidence. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

In the Petitioner's case, we have already concluded that the trial court did not abuse its discretion when it found that the Petitioner failed to establish that the disclosure of Mr. Murphy's videotaped interview *might have* resulted in a different outcome under the standard for coram nobis relief. Likewise, the Petitioner has also failed to establish the higher Brady standard that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding *would have* been different. See Bagley, 473 U.S. at 682. As such, the coram nobis court properly found that the State's failure to provide the petitioner with a copy of Mr. Murphy's videotaped interview did not deny the Petitioner a fair trial or undermine confidence in the jury's verdict.

## Conclusion

For the aforementioned reasons, the judgment of the coram nobis court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE